# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

**ELIZABETH E. NESBITT; ALAN C. BAKER,**

**Plaintiffs-Appellees,**

v.

**U.S. ARMY CORPS OF ENGINEERS; JOHN MCHUGH, Secretary of the Army; THOMAS BOSTICK, Lieutenant General, Commanding General and Chief of Engineers; JOHN S. KEM, Colonel, Northwestern Division Commander; ANDREW D. KELLY, Lieutenant Colonel, Walla Walla District Commander and District Engineer,**

**Defendants-Appellants.**

_____

# ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

_____

# BRIEF FOR APPELLANTS
_____

BENJAMIN C. MIZER
  *Principal Deputy*
  *Assistant Attorney General*

WENDY J. OLSON
  *United States Attorney*

MICHAEL S. RAAB
  (202) 514-4053
ABBY C. WRIGHT
  (202) 514-0664
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7252*
  *Department of Justice*
  *950 Pennsylvania Avenue, N.W.*
  *Washington, D.C. 20530*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ......................................................................1

STATEMENT OF THE ISSUE.............................................................................1

STATEMENT OF THE CASE ..............................................................................1

    A.    Regulatory Background...................................................................1

    B.    Facts and Prior Proceedings Challenging the Army Corps
          Regulation ......................................................................................2

SUMMARY OF ARGUMENT...............................................................................6

STANDARD OF REVIEW ....................................................................................7

ARGUMENT .........................................................................................................7

    I.    The Army Corps Regulation Does Not Burden Conduct
        Protected by the Second Amendment.............................................8

    II.    In Any Event, the Army Corps Regulation Readily Withstands
        Intermediate Scrutiny ...................................................................15

          A.    At most, intermediate scrutiny applies to the challenged
              regulation ...........................................................................15

          B.    The regulation at issue here satisfies the appropriate level
              of  review ............................................................................19

          C.    The district court's reasoning is flawed.............................24

CONCLUSION .....................................................................................................27

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                   <u>**Page**</u>

*Adderley v. Florida,*
    385 U.S. 39 (1966) ...................................................................................13

*Chandler v. Miller,*
    520 U.S. 305 (1997) .................................................................................17

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ........................................................ 3, 4, 5, 8, 9, 10, 16, 18

*Engquist v. Oregon Dep't of Agric.,*
    553 U.S. 591 (2008) .................................................................................13

*GeorgiaCarry.Org, Inc. v. Georgia,*
    687 F.3d 1244 (11th Cir. 2012) ..............................................................16

*GeorgiaCarry Org., Inc. v. U.S. Army Corps of Eng'rs,*
    38 F. Supp. 3d 1365 (N.D. Ga. 2014) ......................................................... 4, 5

*Hernandez v. Reno,*
    91 F.3d 776 (5th Cir. 1996) ....................................................................26

*Jesinger v. Nevada Fed. Credit Union,*
    24 F.3d 1127 (9th Cir. 1994) ....................................................................7

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ............................................................................. 8, 9

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) ............................................................... 18, 26

*NASA v. Nelson,*
    562 U.S. 134 (2011) ...............................................................................16

*Nordyke v. King*,
  563 F.3d 439 (9th Cir. 2009),
    *vacated on reh'g en banc*, 611 F.3d 1015 (9th Cir. 2010) ..................15
  681 F.3d 1041 (9th Cir. 2012) ..................................................................13

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983) ...................................................................................17

*Peruta v. County of San Diego*,
  742 F.3d 1144 (9th Cir. 2014),
    *vacated*, __ F.3d __, No. 10-56971 (9th Cir. 2015) .......................5, 7, 24, 25

*Schall v. Martin*,
  467 U.S. 253 (1984) .................................................................................20

*United States v. Albertini*,
  472 U.S. 675 (1985) .................................................................................17
  783 F.2d 1484 (9th Cir. 1986) ................................................................14

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010) ..................................................................19

*United States v. Chovan*,
  735 F.3d 1127 (9th Cir. 2013),
    *cert. denied*, 135 S. Ct. 187 (Mem.) (2014) ..........................3, 7, 16, 19

*United States v. Corrigan*,
  144 F.3d 763 (11th Cir. 1998) ................................................................17

*United States v. Dorosan*,
  350 F. App'x 874 (5th Cir. 2009) (unpublished) ................................10, 11

*United States v. Jelinski*,
  411 F.2d 476 (5th Cir. 1969) ..................................................................17

*United States v. Kokinda*,
  497 U.S. 720 (1990) ............................................................................17, 19

*United States v. Masciandaro*,
  638 F.3d 458 (4th Cir. 2011) .......................................................11, 13, 19, 20

*United States v. Rozier,*
    598 F.3d 768 (11th Cir. 2010) ..................................................................10

*United States v. Salerno,*
    481 U.S. 739 (1987) ..................................................................................20

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) ....................................................................20

*United States v. Vongxay,*
    594 F.3d 1111 (9th Cir. 2010) ..................................................................10

*Warden v. Nickels,*
    2010 WL 933875 (W.D. Wash. Mar. 11, 2010) ........................................15

*Zepeda v. INS,*
    753 F.2d 719 (9th Cir. 1983) ....................................................................26

## Constitution:

U.S. Const. art. IV, § 3, cl. 2 .........................................................................13

## Statutes:

Credit Card Accountability Responsibility and Disclosure Act of 2009,
    Pub. L. 111-24, § 512(b), 123 Stat. 1734 .............................................. 20, 21

16 U.S.C. § 460d ..........................................................................................14

10 U.S.C. § 2671 ..........................................................................................24

18 U.S.C. § 930(a) ........................................................................................23

18 U.S.C. § 930(d)(3) ....................................................................................23

28 U.S.C. § 1291 ............................................................................................1

28 U.S.C. § 1331 ............................................................................................1

**Regulatory Materials:**

36 C.F.R. § 322.11 (1947 Supp.) ............................................................2

36 C.F.R. pt. 327 ....................................................................................1

36 C.F.R. § 327.1 ..................................................................................23

36 C.F.R. § 327.13 .............................................................................. 2, 5

36 C.F.R. § 327.13(b) .............................................................................5

38 Fed. Reg. 7,552 (Mar. 23, 1973) ......................................................2

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ......................................................................1

**Other Authorities:**

U.S. Army Envtl. Command, *Army Hunting & Fishing Program History*,
   http://aec.army.mil/Services/Conserve/ConservationReimbursablePrograms/
   HuntingFishingHistory.aspx (visited April 15, 2015) ....................................24

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331.
ER 43. The district court entered summary judgment in favor of plaintiffs on
October 13, 2014. ER 4. The government timely filed a notice of appeal on December
10, 2014. ER 1; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction pursuant to
28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

The United States Army Corps of Engineers (Army Corps) constructs,
operates, and maintains infrastructure and other public works projects on federal land
throughout the United States. As authorized by Congress, the Army Corps allows
public access to its land for recreational purposes when consistent with the public
interest and national security. An Army Corps regulation generally restricts visitors
from carrying loaded firearms and ammunition while on Army Corps land. The
regulation permits loaded firearms if possessed by a law enforcement officer and
permits loaded firearms if used at designated hunting or fishing areas, or at Army
Corps shooting ranges. The issue in this case is whether the agency's regulation
violates the Second Amendment.

## STATEMENT OF THE CASE

### A.    Regulatory Background

Federal regulations govern the public use of Corps-managed water-resource
development projects. *See* 36 C.F.R. pt. 327. To provide for "more effective

recreation-resource management of the lake and reservoir projects," the Corps issued

regulations in 1973. 38 Fed. Reg. 7,552, 7,552 (Mar. 23, 1973).[1] As amended, the

regulation entitled "Explosives, firearms, other weapons and fireworks" provides:

> (a) The possession of loaded firearms, ammunition, loaded projectile firing devices, bows and arrows, crossbows, or other weapons is prohibited unless:
>
> > (1) In the possession of a Federal, state or local law enforcement officer;
> > (2) Being used for hunting or fishing as permitted under § 327.8, with devices being unloaded when transported to, from or between hunting and fishing sites;
> > (3) Being used at authorized shooting ranges; or
> > (4) Written permission has been received from the District Commander.
>
> (b) Possession of explosives or explosive devices of any kind, including fireworks or other pyrotechnics, is prohibited unless written permission has been received from the District Commander.

36 C.F.R. § 327.13.

## B. Facts and Prior Proceedings Challenging the Army Corps Regulation

1. Plaintiffs are two residents of Idaho who wish to bring their firearms onto

Army Corps land. Compl. ¶¶ 4-13, ER 43-44. Plaintiff Baker alleges that in March

2013 he made a reservation to camp at Dent Acres Campground. Compl. ¶ 29, ER 47.

Prior to camping, Baker contacted the Corps District Commander to request

---

[1] Regulations specific to particular recreation areas existed long before 1973. *See, e.g.*, 36 C.F.R. § 322.11 (1947 Supp.) (prohibiting loaded firearms and explosives at Great Salt Plains Dam and Reservoir).

permission to bring a firearm onto Dent Acres. Receiving no response, plaintiff Baker did not bring his firearm on his 2013 camping trip. Compl. ¶¶ 32-34, ER 48. Plaintiff Nesbitt (nee Morris) alleges that she uses Corps-administered lands for recreation purposes. Compl. ¶ 12, ER 44. Nesbitt alleges that "[b]ut for Defendants' active enforcement of 36 C.F.R. § 327.13" she would bring a firearm with her during her recreational activities. Compl. ¶ 45, ER 50.

2. Plaintiffs filed suit in August 2013, and, at the same time, filed a motion for a preliminary injunction. Plaintiffs argued that possession of a firearm while camping fits within the core Second Amendment right identified by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008). The government opposed the preliminary injunction, explaining that plaintiffs had not suffered irreparable injury and that the *Heller* decision did not speak to Second Amendment rights in temporary dwellings. The government further explained that government-owned land should be analyzed differently for Second Amendment purposes, relying on the Supreme Court's statement in *Heller* that its decision did not "cast doubt" on "laws forbidding the carrying of firearms in sensitive places." 554 U.S. at 626. The government moved to dismiss.

In January 2014, the district court denied the government's motion to dismiss and granted plaintiffs' motion for a preliminary injunction. Applying this Court's decision in *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013), the district court first held that the regulation burdened the Second Amendment right to carry a firearm for

self-defense purposes. ER 26. The court then applied strict scrutiny to the regulation based on its belief that the core right identified in *Heller* extended to campgrounds. The court held that the regulation failed to withstand strict scrutiny and also held that even under intermediate scrutiny the regulation was "too broad." ER 26-28.

3. Subsequent to the district court's preliminary injunction decision in this case, a federal district court in Georgia denied a request to preliminarily enjoin the Corps regulation. *GeorgiaCarry Org., Inc. v. U.S. Army Corps of Eng'rs*, 38 F. Supp. 3d 1365 (N.D. Ga. 2014). As that court explained, it could not "fathom that the framers of the Constitution would have recognized a civilian's right to carry firearms on property owned and operated by the United States Military, especially when such property contained infrastructure products central to our national security and well being." *Id.* at 1373. The court accepted the government's reliance on the Supreme Court's statement in *Heller* that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626. The Georgia district court observed that although "Defendant Army Corps' property is more expansive than just a 'building,' there is no reason to doubt that the Firearms Regulation, which restricts the use of firearms on military property nearby sensitive infrastructure projects," fits within *Heller*'s discussion of existing "'laws forbidding the

carrying of firearms in sensitive places.'" *GeorgiaCarry*, 38 F. Supp. 3d at 1373 (quoting *Heller*, 554 U.S. at 626).[2]

4. In October 2014, the district court in this case issued an order permanently enjoining the Corps from enforcing its regulation at Army Corps recreational facilities located in Idaho. ER 14.[3] The court relied almost exclusively on this Court's (subsequently vacated) decision in *Peruta v. County of San Diego*, 742 F.3d 1144, 1168 (9th Cir. 2014), *vacated,* __ F.3d __, No. 10-56971 (9th Cir. 2015), which invalidated San Diego's policy of not issuing permits to carry a concealed weapon unless a specific need was shown. Quoting *Peruta*, the district court held that the Army Corps regulation "destroyed" the Second Amendment right to self-defense and was therefore invalid without regard to level of scrutiny. ER 7. The court accepted that the Corps could "regulate" firearms on its property, but held that a prohibition on loaded handguns did not amount to such a regulation. ER 9. The court further stated that the "sensitive places" described in *Heller* could only be buildings, not outdoor land. *Ibid.*

---

[2] Plaintiffs in the Georgia case appealed, and the United States Court of Appeals for the Eleventh Circuit heard oral argument on March 19, 2015.

[3] Although the district court's injunction refers to the entire regulation, the court's analysis focused exclusively on subsection (a) of 36 C.F.R. § 327.13, which concerns firearms. Plaintiffs did not raise, and the court did not address, subsection (b), which prohibits possession of fireworks and explosives. The government therefore does not understand the injunction to apply to § 327.13(b).

The United States Army Corps of Engineers plays a vital role in constructing, maintaining, and protecting our nation's infrastructure and water resources. In order to further the public's interest in safe and enjoyable recreational activities, the Army Corps has opened up portions of its lands for such uses where it can do so consistently with the public interest and national security. In so doing, it has adopted and implemented a variety of regulations to maintain the safety of both park visitors and the projects located on the Army Corps property.

Army Corps land fits comfortably within the category of sensitive places in which the carrying of firearms may be regulated without implicating the Second Amendment. The Army Corps administers the land because it contains an important water-resource or infrastructure project. These projects are indisputably sensitive, and the district court offered no explanation for the counter-intuitive proposition that the Second Amendment was intended to require the Army Corps to abandon all firearms restrictions when it opens up land near such sensitive projects to recreation.

Even assuming that this Court should apply Second Amendment scrutiny to the Army Corps regulation at issue here, there is no justification for strict scrutiny. The Army Corps regulation applies only to government property, and the government enjoys significant latitude to regulate the use of its property. The regulation imposes limited place restrictions on the carrying of firearms, and plaintiffs are free to carry firearms for self-defense on other public and private properties throughout Idaho. At

most, therefore, intermediate scrutiny applies, and the Army Corps regulation is both reasonable and easily sustainable under that level of review.

The district relied almost exclusively on the panel's decision in *Peruta v. County of San Diego*, 742 F.3d 1144, 1168 (9th Cir. 2014), *vacated,* __ F.3d __, No. 10-56971 (9th Cir. 2015). But that decision has since been vacated by this Court's order granting rehearing en banc, and, in any event, did not concern a limited regulation on possession of loaded firearms while on property the government has chosen to open to the public for limited purposes. The district court's judgment should be reversed.

## STANDARD OF REVIEW

The grant of a motion for summary judgment is reviewed de novo. *Jesinger v. Nevada Fed. Credit Union,* 24 F.3d 1127, 1130 (9th Cir. 1994).

## ARGUMENT

This Court has established a two-step analysis for deciding Second Amendment challenges. *See United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 187 (Mem.) (2014). Under this approach, the Court first "asks whether the challenged law burdens conduct protected by the Second Amendment"; if so, the Court determines the "appropriate level of scrutiny." *Id.* at 1136.

Plaintiffs' challenge fails both steps of this inquiry. The Army Corps firearms regulation does not burden conduct protected by the Second Amendment. And, even assuming that the Second Amendment is implicated here, the regulation readily satisfies the appropriate level of scrutiny.

## I.      The Army Corps Regulation Does Not Burden Conduct Protected by the Second Amendment.

A. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects an individual's right to bear arms for purposes of self-defense in the home. The Court thus invalidated a District of Columbia statute that the Court characterized as an "absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 636.

The Court expressly recognized, however, that "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. The Court noted that over the course of history, "commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Ibid.* The Court emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. The Court "identif[ied] these presumptively lawful regulatory measures only as examples; [the] list does not purport to be exhaustive." *Id.* at 627 n.26.

The Supreme Court in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), reaffirmed its statements in *Heller* regarding the limited nature of the Second Amendment right. In *McDonald,* the Supreme Court considered a Chicago ordinance

that, like the District of Columbia provision at issue in *Heller*, "effectively bann[ed] handgun possession by almost all private citizens who reside in the City." 561 U.S. at 750. The Court concluded that the right recognized in *Heller* was incorporated against the States. In so doing, a plurality of the Court reiterated the point from *Heller* "that the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Id.* at 786 (quoting *Heller*, 554 U.S. at 626) (Alito, J., joined by Roberts, C.J., and Scalia and Kennedy, JJ.). And the plurality further noted that the Court "made it clear in *Heller* that [its] holding did not cast doubt on . . . longstanding regulatory measures" including, as most relevant here, "'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" *Id.* (quoting *Heller*, 554 U.S. at 626). The plurality continued: "[w]e repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms." *Id.*[4]

In the course of upholding a federal statute prohibiting felons from possessing firearms, this Court recognized that the Supreme Court's explicit statement in *Heller* that it did not mean to cast doubt on certain categories of longstanding regulatory measures meant that a restriction on firearm possession by felons did not burden

---

[4] Because Justice Thomas's analysis of the reasons for incorporation of the right against the states was different from the plurality's, he did not join this part of the plurality opinion. *See McDonald*, 561 U.S. at 3058 (Thomas, J., concurring in part and

conduct protected by the Second Amendment. *United States v. Vongxay*, 594 F.3d 1111, 1117 (9th Cir. 2010). This Court rejected the defendant's assertion that the Supreme Court's language in *Heller* regarding presumptively lawful regulations was "dicta" and explained that "even given the Second Amendment's individual right to bear arms, felons' Second Amendment rights can be reasonably restricted." *Id.* at 1115, 1117; *see also, e.g., United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (statutes "disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment").

Just as this Court held in *Vongxay* with respect to the restriction that federal law places on the possession of firearms by felons, restrictions on firearm possession in the "sensitive places" described in *Heller* and *McDonald* do not burden conduct protected by the Second Amendment. The Supreme Court in *Heller* provided two examples of such "sensitive places" where firearm prohibitions were presumptively valid: schools and government buildings. The Court made clear, however, that it "identif[ied] these presumptively lawful regulatory measures only as examples; [the] list does not purport to be exhaustive." 554 U.S. at 627 n.26. Relying on this assurance, the Fifth Circuit has recognized, in an unpublished decision, that land adjacent to a Post Office is also a "sensitive place" in which the Postal Service may constitutionally prohibit firearms. *See United States v. Dorosan*, 350 F. App'x 874, 875

_____

concurring in the judgment). Justice Thomas's separate opinion did not discuss the scope of the Second Amendment right.

10

(5th Cir. 2009) (unpublished) (upholding firearms prohibition on Postal Service parking lot); *see also United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011) (declining to decide whether a national park was a "sensitive place," but concluding that the prohibition on loaded firearms passed constitutional muster under intermediate scrutiny).

B. Army Corps land is a "sensitive place" within the meaning of *Heller*. Armed visitors to Army Corps recreational facilities raise precisely the concerns raised by weapons in schools and government buildings. As is the case with schools and government buildings, Army Corps land attracts large numbers of individuals and families with children who congregate for recreational activities with dense concentrations of individuals from diverse backgrounds. ER 37 (Declaration of Stephen B. Austin). In order to maintain order and safety on Army Corps land, the Army Corps has regulations governing boating, swimming, sanitation, fires, pets, and quiet hours. ER 38. It is similarly permissible for the Army Corps to restrict possession of firearms in light of the nature of the public's use of Army Corps land.

And Army Corps property presents unique sensitivities, as well. It is not simply federal land set aside for enjoyment by the public. The Army Corps administers the federal land because it houses one or more public works projects crucial to our infrastructure and national security. *See* ER 39, ¶ 6a ("Recreation is never the sole purpose of a Corps-managed Water Resources Development Project."). The Army Corps operates 702 dams and controls 14,501 miles of levees. ER 37. The Army

Corps provides 24% of the nation's hydropower capacity and enough drinking water to supply 96 million households. *Id.* Indeed, the district court recognized that "[t]hese dams and related structures have been deemed as 'critical infrastructure' by the U.S. Department of Homeland Security's Office of Inspector General on [the] ground that a catastrophic failure could affect populations exceeding 100,000 and have economic consequences surpassing $10 billion." ER 11-12. Protecting such projects is therefore important to both the Army Corps and the public. *See* ER 39, ¶ 6a (explaining that if the Army Corps permitted firearms on its land "the Corps would need to perform a full safety and security assessment of Corps-managed infrastructure to determine how best to secure the facilities"). A prohibition on armed visitors allows the Corps to quickly assess and diffuse threats to these sensitive projects because anyone carrying a loaded firearm outside a designated hunting area is in violation of the regulation and could be stopped on that basis. *Ibid.* ("Early detection of threats to [Corps-managed] infrastructure is aided by current Corps policy, and could be compromised by an a too permissive firearms regulation.").

C. Even setting aside the question of whether the Army Corps land here is a "sensitive place," the Army Corps firearms regulation bears no resemblance to the broad prohibitions that were at issue in *Heller* and *McDonald*. Neither plaintiffs nor the district court has pointed to anything in the historical record suggesting that the Second Amendment was designed to protect self-defense rights when on government property; nor does anyone dispute that the Army Corps regulation is nearly as

longstanding as some of the restrictions referred to specifically in *Heller*. *See* ER 36 (regulation at issue here promulgated in 1973); *see also supra* n.1 (explaining that prohibitions on the carrying of loaded firearms at particular recreation sites date back to the 1940's).

The Army Corps regulation at issue here does not purport to regulate firearms in public places generally, and the Army Corps does not relinquish the ability to protect its infrastructure projects and its employees through restrictions on the carrying of loaded firearms when it chooses to open up its property for limited recreational use. Instead the regulation simply constitutes the permissible exercise of authority to issue regulations ancillary to the proper carrying out of governmental functions on government property. *Cf. Adderley v. Florida*, 385 U.S. 39, 47 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."). In evaluating Second Amendment challenges courts have therefore recognized that it is significant whether the government is acting as a property owner. *See Masciandaro*, 638 F.3d at 473 ("The government, after all, is invested with 'plenary power' to protect the public from danger on federal lands under the Property Clause."(citing U.S. Const. art. IV, § 3, cl. 2)); *Nordyke v. King*, 681 F.3d 1041, 1044-45 (9th Cir. 2012) (en banc) (citing *Engquist v. Oregon Dep't of Agric.,* 553 U.S. 591, 598 (2008)) ("We have long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the

government acting 'as proprietor, to manage [its] internal operation.'") (alteration in original).

In addition, Army Corps land is not simply government land; it is land owned by the military, which only underscores the control the government exercises over that property. The Army Corps retains a great deal of discretion regarding the public's use of its land and may close off access entirely where the interest of public safety and national security require. *Cf. United States v. Albertini*, 783 F.2d 1484, 1487 (9th Cir. 1986) ("[T]he interest of the base commander in maintaining control over the entry of persons to Hickam Air Force Base is substantial; indeed, there is a strong tradition of treating that interest as being in a specially protectible class by itself."); 16 U.S.C. § 460d (allowing the Secretary of the Army to determine that use of Army Corps land by the public is contrary to the public interest). As evidence of the Army Corps' control of its land, the Army Corps has chosen to close the campgrounds at issue for a significant portion of the year. *See* http://www.visitidaho.org/lodging/public-lands-campground/dent-acres/; http://www.recreation.gov/camping/macks-creek-park/r/campgroundSeasonDates.do?contractCode=NRSO&parkId=72330.

D. The district court's decision provided no basis for rejecting the government's argument at step one of the *Chovan* analysis. The district court declared, without elaboration, that outdoor spaces could not be "sensitive places" within the meaning of *Heller*. ER 9. But nothing in *Heller* suggests that outdoor land, or a large area of land, cannot constitute a sensitive place from which a government may

exclude firearms, as two judges of this Court have observed. *See Nordyke v. King*, 563 F.3d 439, 460 (9th Cir. 2009) (open, public spaces "such as County-owned parks, recreational areas, historic sites, parking lots of public buildings . . . and the County fairgrounds" "fit comfortably within the same category as schools and government buildings") (omission in original; internal quotation marks omitted), *vacated on reh'g en banc*, 611 F.3d 1015 (9th Cir. 2010); *see also Warden v. Nickels*, 2010 WL 933875, at *1, *6 (W.D. Wash. Mar. 11, 2010) (upholding a regulation making it illegal to carry concealed firearms or display firearms at certain park facilities where "children and youth are likely to be present and . . . appropriate signage has been posted to communicate to the public that firearms are not permitted at the facility") (omission in original; internal quotation marks omitted). Indeed, we do not understand even plaintiffs to dispute that loaded firearms could be prohibited on dams themselves or other outdoor infrastructure projects.

## II. In Any Event, the Army Corps Regulation Readily Withstands Intermediate Scrutiny.

### A. At most, intermediate scrutiny applies to the challenged regulation.

Even assuming that the Army Corps regulation burdens conduct protected by the Second Amendment, it need only be reasonable and is subject to, at most, intermediate scrutiny.

As this Court has explained in the Second Amendment context, the level of scrutiny applied depends on "the nature of the conduct being regulated and the

degree to which the challenged law burdens the right." *Chovan*, 735 F.3d at 1138

(internal quotation marks omitted). A partial restriction on firearm use on government

property does not implicate the core Second Amendment right, nor does the

prohibition generally burden the exercise of that right outside the context of the use

of Army Corps property.

In *Chovan*, this Court considered a constitutional challenge to the prohibition

on domestic violence misdemeanants possessing firearms. At step one, the Court held

that the government had not proved "that domestic violence misdemeanants in

particular have historically been restricted from bearing arms." 735 F.3d at 1137

(emphasis omitted). Moving to the second step, the Court concluded that

intermediate scrutiny was appropriate because regulation of "firearm possession for

individuals with criminal convictions" does not implicate the core Second

Amendment "'right of law-abiding, responsible citizens to use arms in defense of

hearth and home.'" *Id.* at 1138 (quoting *Heller*, 554 U.S. at 635).

When the Corps acts to regulate its land, it is acting as a property owner, and

not as an entity exercising its police power. *Cf. GeorgiaCarry.Org, Inc. v. Georgia*, 687

F.3d 1244, 1265 (11th Cir. 2012). The Supreme Court has consistently recognized

that, when evaluating government action, a court must consider the context in which

the government is acting. *See NASA v. Nelson*, 562 U.S. 134, 148-49 (2011). "It is a

long-settled principle that governmental actions are subject to a lower level of

[constitutional] scrutiny when the governmental function operating is not the power

to regulate or license, as lawmaker, but, rather, as proprietor, to manage its internal operations." *United States v. Kokinda*, 497 U.S. 720, 725 (1990) (plurality opinion) (internal quotation marks and alterations omitted).

The government may constitutionally limit the public's use of its property. In the First Amendment context, for example, government property may generally be "reserve[d] . . . for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). This is especially true with respect to military land, which remains a nonpublic forum unless the military expressly makes a contrary designation. *See United States v. Corrigan*, 144 F.3d 763, 767 (11th Cir. 1998) ("There is no question, and the appellants do not dispute, that Fort Benning is a nonpublic forum that, like virtually all military installations, has never been regarded or designated as a place open to public speech activities."); *United States v. Albertini*, 472 U.S. 675, 686 (1985) ("Military bases generally are not public fora[.]"); *see also Chandler v. Miller*, 520 U.S. 305, 323 (1997) (Fourth Amendment); *United States v. Jelinski*, 411 F.2d 476, 478 (5th Cir. 1969) (Due Process).

In the Second Amendment context in particular, the Supreme Court recognized in *Heller* that restrictions applicable only on government property are not fairly analogized to restrictions applicable within the home, or even in public places generally, by explicitly stating that its decision did not cast doubt on regulations

applicable only to government buildings. *Heller*, 554 U.S. at 626-27. Even if *Heller* did not remove regulations on government property from the scope of the Second Amendment entirely, *see supra* p. 12-15, at a minimum it confirms that in this context, as in the context of other constitutional rights, the government has greater authority to regulate its own property than it might enjoy when regulating other areas.

Moreover, the limited scope of the regulation at issue here makes clear that, at most, intermediate scrutiny applies. Plaintiffs are free to carry their firearms, as permitted by state law, outside Army Corps property. Plaintiffs may carry firearms in their homes, businesses, on privately owned or state-owned outdoor land, and in most public places. And plaintiffs are in no sense required to use Corps recreational facilities. Individuals "can preserve an undiminished right of self-defense" by not entering Army Corps land or, for example, by hunting on Army Corps land but staying in accommodations not located on Army Corps property. *See Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) ("[W]hen a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places."). Nor is plaintiffs' access to firearms completely prohibited by the Army Corps regulation. Plaintiffs may use firearms at shooting ranges or for hunting in designated areas. And, finally, as explained above, plaintiffs are regulated by the government acting as property owner, not as a sovereign exercising police power. The nature of the conduct regulated by the Army Corps thus plainly does not warrant strict scrutiny. Indeed, the Fourth Circuit properly declined

to apply strict scrutiny in analyzing a similar restriction on carrying firearms on government land. *See, e.g., Masciandaro*, 638 F.3d at 473-74 (upholding National Park Service firearms regulation under intermediate scrutiny).

### B. The regulation at issue here satisfies the appropriate level of review.

As explained above, this Court need only determine whether the Army Corps regulation is reasonable. *Kokinda*, 497 U.S. at 725-26. And it is entirely reasonable for the Army Corps to protect both visitors and water-resource development projects from the risks posed by armed visitors. This Court should therefore uphold the Army Corps regulation as a permissible regulation of the government's use of its own property.

Even if this Court were to apply more rigorous intermediate scrutiny, the Corps regulation readily passes constitutional muster. Under intermediate scrutiny, a law will be upheld where "(1) the government's stated objective [is] significant, substantial, or important; and (2) a reasonable fit [exists] between the challenged regulation and the asserted objective." *Chovan*, 735 F.3d at 1139 (citing *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010)).

Applying intermediate scrutiny, the Fourth Circuit upheld a very similar regulation that prohibited possession of a loaded weapon in a motor vehicle in a

national park area. *See Masciandaro*, 638 F.3d at 459-60.[5] The court concluded "that the government has a substantial interest in providing for the safety of individuals who visit and make use of the national parks." *Id.* at 473. In fact, "[a]lthough the government's interest need not be 'compelling' under intermediate scrutiny, cases have sometimes described the government's interest in public safety in that fashion." *Id.* The court also reasoned that the prohibition at issue was "reasonably adapted to that substantial government interest," given the dangers of loaded firearms and the reasonableness of concluding that "when concealed within a motor vehicle, a loaded weapon becomes even more dangerous." *Id.*

Here, the Corps similarly has an important—indeed, compelling—interest in promoting order and public safety on the land it manages, protecting its water-resource development projects, and protecting visitors from the risk of firearm violence. As the Supreme Court has repeatedly emphasized, "[t]he government's interest in preventing crime . . . is both legitimate and compelling." *United States v. Salerno*, 481 U.S. 739, 749 (1987); *see also Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted.") (internal quotation marks omitted); *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (en banc) ("[N]o one doubts that the goal of . . . preventing armed mayhem[], is an important governmental objective.").

_____

[5] In 2010, Congress enacted a provision allowing loaded firearms on national park land consistent with state law. Credit Card Accountability Responsibility and

And just as in *Masciandaro*, there is a reasonable fit between the safety and security issues the Army Corps faces and its chosen regulation. The projects managed by the Corps—navigational locks and dams, hydropower, water supply, navigation, fish and wildlife—are vast and vital to our nation's infrastructure and national security. The Army Corps manages hundreds of projects throughout the country, and a substantial number of Americans depend on Army Corps projects for their electricity and drinking water. The land surrounding these projects makes up just a small percentage of federal land, but the Army Corps hosts over 370 million visitors per year. ER 16.

The Army Corps must consider a number of factors when deciding whether the public interest is furthered by opening Corps-managed lands for recreation, and when developing rules for their recreational use. ER 37 ¶ 5a. These rules require the Army Corps to consider the safety of visitors and of Corps employees; the protection of natural, cultural, and developed resources; and the promotion of recreational opportunities. *Id.* The Army Corps recognizes that the large number of visitors it manages at its recreational sites, coupled with the diverse backgrounds of campers (including families and children) and the use of alcohol, lead to significant safety concerns. Army Corps regulations are aimed at ensuring that the inevitable conflicts that arise as a result of disagreements about how different visitors make use of Army Corps recreational areas are resolved as quickly and peacefully as possible. ER 37-38,

Disclosure Act of 2009, Pub. L. No. 111-24, § 512(b), 123 Stat. 1734, 1765.

¶ 5c. The Army Corps has reasonably concluded that the presence of a loaded firearm could more quickly escalate tensions resulting from such disagreements, and that such firearms therefore present a significant threat to public safety. *Id.*

Moreover, Congress has not provided the Army Corps with authority to perform many typical law enforcement functions, including carrying firearms, making arrests, or executing search warrants; nor are rangers trained in law enforcement functions. ER 38 ¶ 5e. Full police power at Army Corps projects, including the ability to enforce state and local laws and to place persons under arrest, is exercised solely by state and local authorities. *Id.* As the district court recognized, Corps rangers are frequently involved in volatile situations. Past surveys indicate that an assault on a ranger occurred on average every six days and that rangers and park visitors were frequently subject to verbal abuse and threats of violence. ER 12; ER 18 (Statement of Facts).

One of the ways the Army Corps maintains public safety and infrastructure security at its projects—despite this limited law enforcement authority—is to restrict the public's authority to carry loaded firearms. A permissive firearms policy might very well delay detection of threats to those projects. ER 39 ¶ 6 ("With an overly permissive regulation, Corps officials or other law enforcement officers could be in a position where they would not be able to intervene or ascertain bad intent until a person with a firearm actually uses it."). And the Army Corps has also reasonably decided that allowing armed visitors on Army Corps-managed lands could create a

chilling effect on the enforcement of Corps regulations, as park rangers might be required to confront armed visitors in violation of facility policies. ER 38 ¶ 5e. Thus, in order to fulfill its mission of "manag[ing] the natural, cultural and developed resources of each project in the public interest, [and] providing the public with safe and healthful recreational opportunities," 36 C.F.R. § 327.1, the Army Corps has reasonably determined that limiting loaded firearms to certain designated areas best serves its interest in protecting the safety of visitors and infrastructure projects.

The safety and security concerns described above are presented to a more limited extent, however, when loaded firearms are used solely in designated hunting areas or at shooting ranges. There is less likelihood of the kinds of confrontations that have occurred in Army Corps campgrounds, and Army Corps staff seeing a loaded weapon in such areas have less reason to fear a threat to a water-resource development project or to a park visitor. *See* ER 38-39, ¶¶ 5f, 6a. Moreover, the Army Corps relies on hunting as part of its strategy for managing wildlife on its property consistently with state hunting regulations. The Army Corps regulation thus reasonably permits loaded firearms under these limited circumstances. And the Army Corps' judgment in this area is in line with similar judgments made by Congress. For example, under 18 U.S.C. § 930(a) and (d)(3), most individuals are barred from possessing a "firearm or other dangerous weapon in a Federal facility," except for "lawful carrying of firearms or other dangerous weapons . . . incident to hunting or other lawful purposes." And Congress has permitted commanders to open up military

land for hunting. 10 U.S.C. § 2671; *See generally* U.S. Army Envtl. Command, *Army Hunting & Fishing Program History*, http://aec.army.mil/Services/ Conserve/ConservationReimbursablePrograms/HuntingFishingHistory.aspx (visited April 15, 2015).

### C.    The district court's reasoning is flawed.

In reaching the conclusion that the Army Corps regulation violates the Second Amendment, and permanently enjoining the regulation, the district court relied almost entirely on this Court's decision in *Peruta v. County Of San Diego*, 742 F.3d 1144 (9th Cir. 2014); *see, e.g.,* ER 11 ("This Court, however, is bound by *Peruta*, as discussed above . . . . Thus, the Court declines to follow the analysis of [the United States District Court for the Northern District of Georgia]"). But the panel's decision in *Peruta* has been vacated by this Court's order granting rehearing en banc, and thus may "not be cited as precedent by or to any court of the Ninth Circuit." *Peruta v. County of San Diego*, No. 10-56971, Dkt. No. 193 (Mar. 26, 2015). The foundation upon which the district court built its decision is thus no longer in existence.

In any event, the panel's decision in *Peruta*—even apart from having been vacated—has no bearing here. *Peruta* concerned San Diego County's scheme for issuing permits authorizing the carrying of handguns. California law delegates to counties the authority to issue concealed-carry permits. Plaintiffs challenged San Diego County's policy of granting such licenses only when a person could distinguish

herself from an ordinary individual and "one's personal safety alone [was] not considered good cause." *Peruta,* 742 F.3d at 1148.

In striking down San Diego's scheme, the panel concluded that a restriction on "a responsible, law-abiding citizen's ability to carry a gun outside the home for self-defense" fell within the Second Amendment right to bear arms. *Peruta*, 742 F.3d at 1150 (footnote omitted). The court held that San Diego's policy operated, like the law struck down in *Heller*, to "destroy" that right, and could not satisfy any level of scrutiny. *Id.* at 1170.[6] But the majority did not purport to address a regulation of the type at issue here, which concerns only the carrying of firearms on specific government property and not the regulation of firearms in public places generally. And the majority took pains to reaffirm *Heller's* statement that regulation of firearms is appropriate and that laws forbidding the carrying of firearms into "sensitive places" are presumptively valid. *Id.* at 1178.

As demonstrated above, the Army Corps regulation at issue here concerns a longstanding restriction on the possession of loaded firearms while on sensitive government property. The Army Corps regulation is thus nothing like the broad prohibitions at issue in *Heller* or in *Peruta,* and the Army Corps regulation has no impact on plaintiffs' ability to carry firearms for self-defense except when plaintiffs

---

[6] In dissent, Judge Thomas explained that the law before the Court concerned the carrying of concealed weapons, and *Heller* had made clear that it did not cast doubt on "California's 'presumptively lawful' and longstanding restrictions on carrying concealed weapons in public." *Peruta*, 742 F.3d at 1179 (Thomas, J., dissenting)

choose to camp on Army Corps land. *See Moore*, 702 F.3d at 940 ("In contrast, when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need."). Plaintiffs remain free to carry firearms in their homes and in unrestricted public areas.

In addition, the district court erred in the scope of the relief that it entered. In the absence of a class action, any injunction should have been limited to the individual plaintiffs named in the complaint. *See Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983) ("On remand, the injunction must be limited to apply only to the individual plaintiffs unless the district judge certifies a class of plaintiffs."); *see also Hernandez v. Reno*, 91 F.3d 776, 781 (5th Cir. 1996).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

BENJAMIN C. MIZER
  *Principal Deputy Assistant*
  *Attorney General*

WENDY J. OLSON
  *United States Attorney*

MICHAEL S. RAAB
  (202) 514-4053
  S/ ABBY C. WRIGHT
ABBY C. WRIGHT
  (202) 514-0664
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7252*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, N.W.*
  *Washington, D.C. 20530*

APRIL 2015

## STATEMENT OF RELATED CASES

Counsel for appellants are not aware of any related cases as defined in Ninth Circuit Rule 28-2.6.

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,274 words excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

s/*Abby C. Wright*
ABBY C. WRIGHT
Counsel for Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2015, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

The plaintiffs in this case are registered CM/ECF users.

s/*Abby C. Wright*
ABBY C. WRIGHT
Counsel for Appellants