No. 14-36049

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ELIZABETH E. NESBITT; ALAN C. BAKER,

Plaintiffs-Appellees,

v.

U.S. ARMY CORPS OF ENGINEERS; JOHN McHUGH, Secretary of the Army; THOMAS BOSTICK, Lieutenant General, Commanding General and Chief of Engineers; JOHN S. KEM, Colonel, Northwestern Division Commander; ANDREW D. KELLY, Lieutenant Colonel, Walla Walla District Commander and District Engineer,

Defendants-Appellants.

On Appeal from the U.S. District Court for the District of Idaho,
Civil Action No. 3:13-cv-00336-BLW
The Honorable B. Lynn Winmill, U.S. District Court Judge

## APPELLEES' ANSWER BRIEF

Steven J. Lechner
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado  80227
(303) 292-2021
lechner@mountainstateslegal.com

Attorney for Plaintiffs-Appellees

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT REGARDING JURISDICTION .................................... 1

STATEMENT OF THE ISSUES................................................... 2

STATEMENT OF THE CASE...................................................... 2

I.  LEGAL BACKGROUND............................................................ 2

    A.  The Second Amendment. ................................................... 2

    B.  The Corps' Ban ................................................................ 3

II.  FACTUAL BACKGROUND........................................................ 5

III.  PROCEDURAL BACKGROUND .............................................. 6

SUMMARY OF ARGUMENT ................................................... 10

ARGUMENT ................................................................................ 12

I.  STANDARDS OF REVIEW........................................................ 12

    A.  Summary Judgment............................................................. 12

    B.  Second Amendment ........................................................... 12

    C.  Permanent Injunction ......................................................... 14

II.  THE CORPS' BAN BURDENS CONDUCT PROTECTED
BY THE SECOND AMENDMENT........................................... 14

    A.  The Second Amendment Applies Outside The Home ....... 15

    B.  The Second Amendment Applies Inside Tents On Public
Lands ................................................................................... 16

C.     The Second Amendment Applies On Corps-Managed Lands .................................................................................. 17

      1.    Corps-managed lands are not sensitive places......... 18

      2.    Lands owned by the United States or lands managed by agencies within the U.S. Army are not Second Amendment-free zones .............................. 29

III.    THE CORPS' BAN VIOLATES THE SECOND AMENDMENT .......................................................... 33

    A.    The Corps' Ban Is Categorically Unconstitutional ............ 33

    B.    The Corps' Ban Does Not Survive Strict Scrutiny ............ 36

    C.    The Corps' Ban Does Not Survive Intermediate Scrutiny. 46

    D.    The Corps' Argument For Reasonableness Review Is Spurious ........................................................................... 49

IV.    *GEORGIACARRY.ORG* PROVES THAT THE CORPS HAS NOT SATISFIED ITS EVIDENTIARY BURDEN IN THE INSTANT CASE ........................................................................ 51

V.    THE PERMANENT INJUNCTION IS APPROPRIATELY LIMITED ...................................................................... 55

CONCLUSION ...................................................................... 56

STATEMENT OF RELATED CASES ................................................. 58

CERTIFICATE OF COMPLIANCE ....................................................... 59

CERTIFICATE OF SERVICE ............................................................. 60

ADDENDUM — Credit Card Act of 2009, § 512, Pub. L. 111-24, 123 Stat. 1734 (2009)

# TABLE OF AUTHORITIES

**Page**

## CASES

*Animal Legal Def. Fund v. Veneman,*
    490 F.3d 725 (9th Cir. 2007) ............................................................ 9

*Ayotte v. Planned Parenthood of N. New England,*
    546 U.S. 320 (2006) ........................................................................ 40

*Boardley v. U.S. Dept. of Interior,*
    615 F.3d 508 (D.C. Cir. 2010) ........................................................ 47

*Bonidy v. USPS,*
    2015 WL 3916547 (10th Cir. 2015) ................................................ 20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
    447 U.S. 557 (1980) ........................................................................ 47

*Christian Legal Soc. Chapter of Univ. of Cal. v. Wu,*
    626 F.3d 483 (9th Cir. 2010) .......................................................... 35

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010) ........................................................................ 40

*Citizens United v. Gessler,*
    773 F.3d 200 (10th Cir. 2014) ........................................................ 40

*Coca–Cola Co. v. Overland, Inc.,*
    692 F.2d 1250 (9th Cir. 1982) ........................................................ 55

*Dahnke–Walker Milling Co. v. Bondurant,*
    257 U.S. 282 (1921) ........................................................................ 40

*Dexter v. Kirschner,*
    984 F.2d 979 (9th Cir. 1992) .......................................................... 14

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .................................................................. *passim*

*Engquist v. Oregon Dept. of Agr.*,
    553 U.S. 591 (2008).......................................................... 31, 32

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ............................................ 13, 14, 39

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010).......................................................... 19

*Frisby v. Schultz*,
    487 U.S. 474 (1988).......................................................... 44

*Georgiacarry.org, Inc. v. U.S. Army Corps of Engineers*,
    38 F. Supp. 3d 1365 (N.D. Ga. 2014)................................. 51

*Georgiacarry.org, Inc. v. U.S. Army Corps of Engineers*,
    2015 WL 3555822 (11th Cir. 2015) .................................51, 52, 53, 54

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*")................... 13

*Initiative and Referendum Institute v. USPS*,
    417 F.3d 1299 (D.C. Cir. 2005)......................................... 51

*ISKCON Miami, Inc. v. Metropolitan Dade County*,
    147 F.3d 1282 (11th Cir. 1998) ......................................... 50

*Jesinger v. Nevada Fed. Credit Union*,
    24 F.3d 1127 (9th Cir. 1994) ............................................. 12

*Kyllo v. United States*,
    533 U.S. 27 (2001)............................................................ 16

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) ............................................. 55

*Louisiana Public Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986).......................................................... 31

*Marbury v. Madison,*
    5 U.S. 137 (1803) ............................................................... 31

*McDonald v. Chicago,*
    561 U.S. 742 (2010) ........................................................... *passim*

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) ............................................ 15, 23, 45

*NASA v. Nelson,*
    562 U.S. 134 (2011) ........................................................... 32

*Nordyke v. King,*
    563 F.3d 439 (9th Cir. 2009) ........................................ 24, 25, 26, 27

*Nordyke v. King,*
    611 F.3d 1015 (9th Cir. 2010) (*en banc*) ........................... 24

*Nordyke v. King,*
    681 F.3d 1041 (9th Cir. 2012) (*en banc*) ........................... 26

*Perry Education Assn. v. Perry Local Educators' Assn.,*
    460 U.S. 37 (1983) ............................................................. 49, 50

*Peruta v. Cnty. of San Diego,*
    742 F.3d 1144 (9th Cir. 2014) .......................................... *passim*

*Peruta v. Cnty. of San Diego,*
    781 F.3d 1106 (9th Cir. 2015) .......................................... 9

*Printz v. United States,*
    521 U.S. 898 (1997) ........................................................... 31

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ........................................................... 27

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
    411 U.S. 1 (1973) ............................................................... 36

*Schad v. Borough of Mt. Ephraim,*
452 U.S. 61 (1981) .......................................................... 53

*Schneider v. State of New Jersey,*
308 U.S. 147 (1939) ........................................................ 53

*Silverman v. United States,*
365 U.S. 505 (1961) ........................................................ 17

*Supreme Court of New Hampshire v. Piper,*
470 U.S. 274 (1985) ........................................................ 47

*United States v. Albertini,*
472 U.S. 675 (1985) ........................................................ 32

*United States v. Apel,*
134 S. Ct. 1144 (2014) .............................................. 32, 33

*United States v. Barton,*
633 F.3d 168 (3d Cir. 2011) .......................................... 27

*United States v. Basher,*
629 F.3d 1161 (9th Cir. 2011) ....................................... 16

*United States v. Chester,*
628 F.3d 673 (4th Cir. 2010) ......................................... 27

*United States v. Chovan,*
735 F.3d 1127 (9th Cir. 2013) ................................ *passim*

*United States v. Doe,*
968 F.2d 86 (D.C. Cir. 1992) ......................................... 41

*United States v. Dorosan,*
2008 WL 2622996 (E.D. La. 2008) ............................... 20

*United States v. Dorosan,*
2009 WL 273300 (E.D. La. 2009) ................................. 20

*United States v. Dorosan*,
    350 F. App'x 874 (5th Cir. 2009) ....................................................... 20

*United States v. Esquivel*,
    88 F.3d 722 (9th Cir. 1996) ............................................................ 42

*United States v. Gooch*,
    6 F.3d 673 (9th Cir. 1993) ............................................................ 16, 17

*United States v. Grace*,
    461 U.S. 171 (1983)........................................................................ 33

*United States v. Kokinda*,
    497 U.S. 720 (1990)........................................................................ 30

*United States v. Masciandaro*,
    638 F.3d 458 (4th Cir. 2011) ........................................... 18, 19, 37, 38

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000)................................................................... 43, 44

*United States v. Rozier*,
    598 F.3d 768 (11th Cir. 2010) ....................................................... 29

*United States v. Sandoval*,
    200 F.3d 659 (9th Cir. 2000) ........................................................ 16

*United States v. Vongxay*,
    594 F.3d 1111 (9th Cir. 2010) ................................................... 28, 29

*United States v. Williams*,
    616 F.3d 685 (7th Cir. 2010) .................................................... 28, 47

*United States v. Zannino*,
    895 F.2d 1 (1st Cir. 1990)............................................................. 35

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)................................................................... 47–48

*Warden v. Nickels*,
  697 F. Supp. 2d 1221 (W.D. Wash. 2010) ....................................... 24, 25

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)................................................................. 36

## Constitutional Provisions

U.S. Const. art. IV § 3, cl. 2.................................................... 30

U.S. Const. amend. II............................................................. *passim*

U.S. Const. amend. IV ........................................................... 16, 17

## Statutes

16 U.S.C. § 460d .................................................................. 3

18 U.S.C. § 922(g)(1)............................................................ 28, 29

18 U.S.C. § 922(g)(9)........................................................... 13, 29, 46, 48

18 U.S.C. § 930(a) .............................................................. 21, 22

18 U.S.C. § 930(g)(1)........................................................... 21

18 U.S.C. § 930(h) .............................................................. 22

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 1331 ................................................................. 1

Idaho Code § 18-3302............................................................ 48

## Regulations

36 C.F.R. § 261.58(m) .......................................................... 23

36 C.F.R. § 327.8 ............................................................... 4

36 C.F.R. § 327.12(b) ................................................................. 42

36 C.F.R. § 327.12(c) ................................................................. 42

36 C.F.R. § 327.12(d) ................................................................. 42

36 C.F.R. § 327.12(e) ................................................................. 42

36 C.F.R. § 327.12(f) ................................................................. 42

36 C.F.R. § 327.13(a) ................................................................. *passim*

36 C.F.R. § 327.13(b) ................................................................. 4

36 C.F.R. § 327.13(a)(2) ............................................................ 22

36 C.F.R. § 327.13(a)(3) ............................................................ 22

36 C.F.R. § 327.13(a)(4) ............................................................ 5, 6

36 C.F.R. § 327.25 ..................................................................... 4

43 C.F.R. § 423.30 ..................................................................... 23

43 C.F.R. § 423.30(a) ................................................................. 45

43 C.F.R. § 423.30(b) ................................................................. 45

43 C.F.R. § 8365.1–7 ................................................................. 23

**Federal Register**

12 Fed. Reg. 8,725 (Dec. 23, 1947) ......................................... 18

36 Fed. Reg. 7,552 (Mar. 23, 1973) .......................................... 3

65 Fed. Reg. 6,891 (Feb. 11, 2000) ........................................... 3

## Rules

Fed. R. App. P 32(a)(7)(C) ....................................................... 58

Ninth Circuit Rule 32-1 .......................................................... 58

## Other Authorities

David B. Kopel, *The Samurai, The Mountie, And The Cowboy* 1992) ................................................................. 44

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009)................................... 38

Philip J. Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from A Social Welfare Perspective*, 56 UCLA L. Rev. 1041 (2009) ............................................................. 48

# STATEMENT REGARDING JURISDICTION

On August 5, 2013, Plaintiffs-Appellees, Elizabeth E. Nesbitt (née Morris) and Alan C. Baker, filed suit against the U.S. Army Corps of Engineers and federal officials (collectively "Corps"), alleging that the Corps' regulation, 36 C.F.R. § 327.13(a), denied Plaintiffs the right to keep and bear arms for self-defense on Corps-managed lands in violation of the Second Amendment.  Complaint ¶¶ 4–19, 46–55; Excerpts of Record ("ER") 43–46, 50–51.  The District Court had jurisdiction, pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arose under the Second Amendment to the U.S. Constitution.  Complaint ¶ 2; ER43.

On October 13, 2014, the District Court held that 36 C.F.R. § 327.13(a), was unconstitutional as it denied Plaintiffs the right to keep and bear arms for self-defense on Corps-managed lands, and permanently enjoined the Corps from enforcing its ban in the State of Idaho, where Plaintiffs reside and primarily recreate.  ER5–14.  On that same day, the District Court entered final judgment in favor of Plaintiffs as to both of their claims for relief.  ER4.  On December 10, 2014, the Corps appealed.  ER1–2.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether the Corps' regulation, 36 C.F.R. § 327.13(a), which denies Plaintiffs the right to keep and bear arms for self-defense on Corps-managed lands, violates the Second Amendment.

Whether the District Court properly limited the scope of the permanent injunction to Corps-managed lands in Idaho, where Plaintiffs reside and primarily recreate.

## STATEMENT OF THE CASE

## I.  LEGAL BACKGROUND.

### A.  The Second Amendment.

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570, 579–595 (2008), the Supreme Court ruled that the Second Amendment codifies a pre-existing, individual right to keep and bear arms for the core purpose of self-defense.  Two years later, the Court reaffirmed its ruling in *Heller*.  *McDonald v. Chicago*, 561 U.S. 742, 767 (2010) ("Self-defense is a basic right" and "the central component" of the Second Amendment's guarantee of an individual's right to keep and bear arms.").

**B.     The Corps' Ban.**

Pursuant to its non-military, civil works mission, the Corps manages 422 water resource development projects in 43 states.  ER35; Supplemental Excerpts of Record ("SER") 12.  These projects provide the public with recreational opportunities on 12 million acres (land and water).[1]  ER35; SER12.  These 12 million recreational acres include 55,000 acres of shoreline, 7,700 miles of recreational trails, 92,000 campsites, 3,500 boat launch ramps, 32 shooting ranges, and numerous hunting areas.  ER35, 38; SER12.  The Corps' authority to manage these lands is derived from 16 U.S.C. § 460d, which provides that the Corps "is authorized to construct, maintain, and operate public park and recreational facilities at water resource development projects under the control of the Department of the Army …."  Congress also instructed that these "public park and recreational facilities" be "generally" open to public use.  *Id.*

In 1973, the Corps issued 36 C.F.R. § 327.13(a), which makes it unlawful to possess or carry a firearm for-self-defense on Corps-managed lands.  36 Fed. Reg. 7,552, 7,553 (Mar. 23, 1973).  Since that time, the regulation has remained largely unchanged.[2]  The regulation now provides:

---

[1] As used herein "Corps-managed lands" means those 12 million recreational acres (land and water) managed by the Corps.

[2] The Corps last revised the regulation in 2000, eight years before *Heller*.  65 Fed. Reg. 6,891 (Feb. 11, 2000).

(a)     *The possession of loaded firearms, ammunition*, loaded projectile firing devices, bows and arrows, crossbows, or other weapons *is prohibited unless*:

      (1)    In the possession of a Federal, state or local law enforcement officer;

      (2)    Being used for hunting or fishing as permitted under § 327.8, with devices being unloaded when transported to, from or between hunting and fishing sites;

      (3)    Being used at authorized shooting ranges; or

      (4)    Written permission has been received from the District Commander.

36 C.F.R. § 327.13(a) (all emphasis added).[3]

By its plain language, 36 C.F.R. § 327.13(a) prohibits possessing or carrying either a loaded firearm or an unloaded firearm along with ammunition for self-defense on Corps-managed lands ("Corps' ban").[4] Yet, 36 C.F.R. § 327.13(a) allows loaded firearms to be possessed and carried for hunting and target shooting on Corps-managed lands, so long as the firearms are unloaded when being transported to and from those areas. Violators of 36 C.F.R. § 327.13(a) "may be punished by a fine of not more than $5,000 or imprisonment for not more than six months or both …." 36 C.F.R. § 327.25.

---

[3] Subsection (b) of 36 C.F.R. § 327.13 is not at issue in this case.

[4] The regulation apparently contemplates that the District Commander may provide written permission to individuals to possess and carry a loaded firearm for self-defense on Corps-managed lands. But, as demonstrated below, that exception is illusory.

## II.    FACTUAL BACKGROUND.

Plaintiff, Elizabeth E. Nesbitt (née Morris), is a law-abiding, responsible citizen. SER6–10. She is over 21 years old, has no history of substance abuse, has no criminal record, is not subject to a protection order, has demonstrated competency with a handgun, and has been licensed to carry a concealed handgun in the State of Idaho.[5] SER6. Ms. Nesbitt regularly uses Corps-managed lands in Idaho for recreation, including Dworshak Dam and Reservoir. SER7–8, 15. Although Ms. Nesbitt regularly carries a concealed handgun for self-defense (SER5), the Corps' ban makes it unlawful for her to possess or carry that handgun for self-defense when on Corps-managed lands.[6] SER7–8.

On June 10, 2013, Ms. Nesbitt formally requested that the Corps' District Commander, Andrew D. Kelly, provide her written permission, under 36 C.F.R. § 327.13(a)(4), so that she could possess and carry a firearm for self-defense while on Corps-managed lands.[7] SER8–10. Mr. Kelly has failed to respond to Ms. Nesbitt's request. ER8.

---

[5] Because of threats and physical attacks made against Ms. Nesbitt by a former neighbor, she was issued an emergency carry license in 2012. SER6.

[6] But for the ban in 36 C.F.R. § 327.13(a), Ms. Nesbitt would consider camping at Dworshak Dam and Reservoir. SER7.

[7] In light of the previous threats and attacks, Ms. Nesbitt made this request anonymously because she did not want to reveal to her former neighbor that the Corps' ban renders her defenseless when she is on Corps-managed lands. SER8–9.

Plaintiff, Alan C. Baker, is a law abiding, responsible citizen. SER1–3. Mr. Baker is over 21 years old, has no history of substance abuse, has no criminal record, is not subject to a protection order, has demonstrated competency with a handgun, and has been licensed carry a concealed handgun in the State of Idaho.[8] SER1. Mr. Baker is a life-long outdoorsman and regularly recreates and camps on Corps-managed lands in Idaho, including Dworshak Dam and Reservoir. SER07 Although Mr. Baker carries a handgun for self-defense, the Corps' ban makes it unlawful for Mr. Baker to possess or carry that handgun for self-defense when on Corps-managed lands. SER1–2.

On April 22, 2013, Mr. Baker formally requested that the Corps' District Commander, Andrew D. Kelly, provide him written permission, under 36 C.F.R. § 327.13(a)(4), so that he could possess and carry a firearm for self-defense while on Corps-managed lands. SER4–5. Mr. Kelly has failed to respond to Mr. Baker's request. SER2.

## III. PROCEDURAL BACKGROUND.

On August 5, 2013, Plaintiffs filed this action against the Corps asserting two claims for relief. First, they alleged that 36 C.F.R. § 327.13(a) violates the Second Amendment because it makes it unlawful for them to possess a loaded

---

[8] Mr. Baker is also a NRA-Certified Home Firearm Safety, Personal Protection In The Home, Rifle, Pistol, and Shotgun Instructor. SER1. In addition to Idaho, Mr. Baker is licensed to carry a concealed handgun pursuant to the laws of the States of Utah, Oregon, and Arizona. *Id*.

firearm for self-defense in a temporary dwelling, such as a tent, on Corps-managed lands. ER50. Second, they alleged that 36 C.F.R. § 327.13(a) violates the Second Amendment because it makes it unlawful for Plaintiffs to carry—openly, concealed, or in a vehicle—a loaded firearm for self-defense on Corps-managed lands. ER51. Concurrently, Plaintiffs moved for a preliminary injunction to enjoin the Corps from enforcing 36 C.F.R. § 327.13(a) pending a decision on the merits. *See* ER22–32.

Subsequently, the Corps filed an opposition to Plaintiffs' motion for a preliminary injunction and filed a motion to dismiss. *See* ER23–29. In support of its arguments, the Corps provided a self-serving, declaration from a Corps employee. *See* ER33–40.

On January 10, 2014, the District Court issued a Memorandum Decision and Order, granting Plaintiffs' motion for preliminary injunction and denying the Corps' motion to dismiss. ER22–32. In so doing, the District Court first ruled that the Corps' regulation burdened Plaintiffs' Second Amendment rights to possess and carry a firearm for self-defense. ER25. The District Court then ruled that the burden imposed by the regulation on Plaintiffs' Second Amendment rights was substantial—both as to possessing a loaded firearm for self-defense in a tent and as to carrying a loaded firearm for self-defense outside of a tent. ER26–28. In light of these substantial burdens, the District Court ruled that Plaintiffs were likely to

succeed on the merits of their claims, under either strict or intermediate scrutiny. ER28–29. Because Plaintiffs satisfied the other requirements for the issuance of a preliminary injunction, the District Court preliminarily enjoined the Corps from enforcing 36 C.F.R. § 327.13(a) until "further notice." ER32.

Although the District Court enjoined the Corps, it noted that its decision was "preliminary in nature" and that the Corps was entitled to present evidence in support of its ban before a final decision on the merits. ER31 The Corps rejected this invitation. Instead, the Corps simply moved for summary judgment relying largely on the same self-serving, declaration.[9] Subsequently, Plaintiffs timely filed their own motion for summary judgment as to both of their claims and responded to the Corps' motion for summary judgment. *See e.g.*, SER19–35.

On October 13, 2014, the District Court issued a Memorandum Decision, granting summary judgment in favor of Plaintiffs as to both of their claims for relief and denying the Corps' motion for summary judgment. ER5–14. Based upon this Court's decision in *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013), the District Court articulated the two-step test it would use for reviewing Plaintiffs' Second Amendment claims. ER6–7. In accordance with this Court's decision in *Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014)

---

[9] Prior to moving for summary judgment, the Corps did lodge with the District Court those documents determined by the Corps to comprise its administrative record for the Corps' 2000 revision of 36 C.F.R. Part 327. *See* SER17–18.

*reh'g en banc granted*, 781 F.3d 1106 (9th Cir. 2015)[10] the District Court also

noted that the two-step test is not used when instead of merely burdening the right

to bear arms, the law "destroys the right." ER 7. When that occurs, the law is

"unconstitutional 'under any light.'" ER7 (quoting *Peruta,* 742 F.3d at 1168).[11]

 After stating the standard of review, the District Court ruled that the Second

Amendment protects, *inter alia*: "the right to carry a firearm for self-defense

purposes" ER8 (citing *Heller*, 554 U.S. at 628). The District Court also ruled that

the right to carry a firearm for self-defense purposes "extends outside the home."

ER 8 (citing *Peruta*, 742 F.3d at 1166). Based upon these rulings, the District

Court ruled that the Corps' ban burdened conduct protected by the Second

Amendment:

> The Corps' regulation bans carrying a loaded firearm for the purpose
> of self-defense. It also bans carrying an unloaded firearm along with
> its ammunition…. An unloaded firearm is useless for self-defense
> purposes without its ammunition…. Consequently, the regulation
> does impose a burden on plaintiffs' Second Amendment rights.

---

[10] In granting rehearing en banc, this Court ruled that the three-judge panel opinion in *Peruta* "shall not be cited as precedent by or to any court the Ninth Circuit. *Peruta*, 781 F.3d at 1106. Subsequent citations herein to *Peruta* are for persuasive purposes only. *See Animal Legal Def. Fund v. Veneman*, 490 F.3d 725, 730 (9th Cir. 2007) (Thomas, J., concurring in part and dissenting in part).

[11] This categorical test had its genesis in *Heller* itself. *Peruta*, 742 F.3d at 1168 ("A law effecting a '*destruction* of the right' rather than merely *burdening* it is, after all, an infringement under any light. (quoting *Heller*, 554 U.S. at 629) (emphasis in original) (quotation omitted)).

ER8.

More importantly, the District Court ruled that the Corps' "*complete ban* "goes beyond merely burdening Second Amendment rights but 'destroys' those rights for law-abiding citizens carrying operable firearms for the lawful purpose of self-defense." ER8 (emphasis added). Based upon the destruction of those rights, the District Court held that Corps' ban is categorically unconstitutional because "it is invalid no matter what degree of scrutiny is used in its evaluation." ER8 (citing *Peruta*, 742 F.3d at 1168–70); *see also* ER13 ("While the Corps retains the right to regulate the possession and carrying of handguns on Corps property, this regulation imposes an outright ban, and is therefore unconstitutional under any level of scrutiny, as set forth in *Heller* and *Peruta*."). Accordingly, the District Court entered judgment declaring 36 C.F.R. § 327.13(a) unconstitutional and enjoining the Corps' from enforcing it in the State of Idaho. ER4.

### SUMMARY OF ARGUMENT

Self-defense is an inherent personal right and the central component of the Second Amendment's fundamental right to keep and bear arms. The Corps' ban denies law-abiding, responsible citizens the ability to possess or carry firearms for self-defense on Corps-managed lands. The District Court properly ruled that the Corps' ban was categorically unconstitutional because it destroys the Second

10

Amendment rights of law-abiding, responsible citizens to possess and carry firearms for self-defense on Corps-managed lands.

Even if the Corps' ban is not categorically unconstitutional, the Corps has not proven that its ban is constitutional. The Corps' ban burdens conduct protected by the Second Amendment because the right to keep and bears arms applies outside the home and on Corps-managed lands in Idaho. This burden is severe because it completely eliminates the Second Amendment rights of law-abiding, responsible citizens to possess and carry firearms for self-defense on Corps-managed lands in Idaho. Despite this severe burden, the Corps has provided no evidence of a compelling interest for its ban on Corps-managed lands in Idaho. Nor has the Corps proven that its ban is narrowly tailored to serve a compelling interest because the Corps has less restrictive means available to it, as demonstrated by the laws governing the possession and carrying of firearms on other public lands.

The Corps' ban also fails intermediate scrutiny. Again, the Corps has provided no evidence of a substantial interest for its ban on Corps-managed lands in Idaho. Nor has the Corps proven that its ban is substantially related to its generalized public safety concerns. The Corps ban is simply too broad because it unnecessarily disarms an entire group of individuals, *i.e.*, law-abiding, responsible citizens, who, by definition, pose no public safety concerns.

Finally, the District Court appropriately limited the scope of the permanent injunction to Corps-managed lands in Idaho, where Plaintiffs reside and primarily recreate. Limiting the scope of the permanent injunction further to just Plaintiffs would disserve the interests of the Corps, the taxpayers, and the judiciary.

## ARGUMENT

I.   **STANDARDS OF REVIEW**.

   A.   **Summary Judgment.**

   This Court reviews the grant or denial of a motion for summary judgment *de novo*. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994).

   B.   **Second Amendment.**

   According to the Supreme Court*,* firearm bans are reviewed based upon on the text, history, and tradition of the Second Amendment, not by a balancing test such as strict or intermediate scrutiny.

> The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government— the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.

*Heller*, 554 U.S. at 634–35. This is so, because the Second Amendment itself "is the very *product* of an interest-balancing by the people ...." *Id*. at 635 (emphasis in

original); *McDonald*, 561 U.S. at 785 (plurality opinion) ("In *Heller ...*, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing ...."); *see Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J. dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.").

This Court, however, applies a two-step test to Second Amendment challenges. The first step asks "whether the challenged law burdens conduct protected by the Second Amendment" *Chovan*, 735 F.3d at 1136. The scope of the conduct protected is based upon the "text" and "history" and "tradition" of the Amendment. *Peruta*, 742 F.3d at 1150 (citing *Heller*, 554 U.S. at 595; *McDonald*, 561 U.S. at 785 (plurality opinion)). If the government can prove that a challenged restriction burdens only conduct not protected by the Second Amendment, the restriction is not subject to further review. *Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011); *see Chovan*, 735 F.3d at 1137 (ruling that the federal government failed to prove that 18 U.S.C. § 922(g)(9) burdened conduct only outside the scope of the Second Amendment).

If, however, the government fails to meet its burden of proof, a reviewing court must "apply an appropriate level of scrutiny." *Chovan*, 735 F.3d at 1136. A

restriction that destroys or abrogates a core Second Amendment right is categorically unconstitutional. *Peruta*, 742 F.3d at 1167 (citing *Heller*, 554 U.S. at 628–29). A restriction that burdens—but does not abrogate—a core Second Amendment right is subject to heightened scrutiny—either strict or intermediate, depending on: (1) how close the law comes to a core Second Amendment right; and (2) "'the severity of the law's burden on the right.'" *Chovan*, 735 F.3d at 1138 (quoting *Ezell*, 651 F.3d at 703). Under no circumstances is a restriction that burdens conduct protected by the Second Amendment subject to rational basis review. *Heller*, 554 U.S. at 629 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

### C.   Permanent Injunction.

This Court reviews a district court's grant of a permanent injunction "for an abuse of discretion or application of erroneous legal principles." *Dexter v. Kirschner*, 984 F.2d 979, 982 (9th Cir. 1992).

## II.   THE CORPS' BAN BURDENS CONDUCT PROTECTED BY THE SECOND AMENDMENT.

It is undisputed that the Corps' ban prohibits Plaintiffs from possessing (*e.g.*, in a tent) and carrying (openly, concealed, or in a vehicle) a loaded firearm for self-defense on Corps-managed lands. The "text," "history," and "tradition" of the

Amendment proves that the Corps' ban burdens conduct protected by the Second Amendment.

## A.     The Second Amendment Applies Outside The Home.

The Supreme Court confirmed that the "central" or "core" purpose of the right to keep and bear arms is self-defense. *Heller*, 554 U.S. at 628 (concluding that "the inherent right of self-defense has been central to the Second Amendment right"); *id*. at 630 (describing self-defense as the right's "core lawful purpose"); *McDonald*, 561 U.S. at 749–50 ("Two years ago, in [*Heller*], we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense …."). Although, the specific holding in *Heller* was to strike down the District of Columbia's ban on keeping operable firearms in the home for self-defense, the Court necessarily concluded that the Second Amendment extends outside the home. Indeed, the Court ruled, in no uncertain terms, that, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584. The Court also noted that "[w]hen used with 'arms," the term "bear" refers to carrying for a particular purpose—confrontation." *Id*. Because "confrontations are not limited to the home ... [a] right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Therefore, the Second Amendment applies outside the home.

**B.    The Second Amendment Applies Inside Tents On Public Lands.**

Because the Second Amendment is an individual right that extends outside the home, it would necessarily apply to a temporary dwelling, such as tent, on public lands.  For example, this Court has repeatedly held that the people may assert Fourth Amendment rights in tents on public lands.  *United States v. Gooch*, 6 F.3d 673, 677–78 (9th Cir. 1993) (state campground); *United States v. Sandoval*, 200 F.3d 659, 660–61 (9th Cir. 2000) (lands managed by the Bureau of Land Management); *United States v. Basher*, 629 F.3d 1161, 1169 (9th Cir. 2011) (lands managed by the U.S. Forest Service).  In addition, because both the Second and Fourth Amendments protect individual rights, there is no reason to conclude that "the people" can assert Fourth Amendment rights in tents on public lands, but not Second Amendment rights.  *See Heller*, 554 U.S. at 579 (the "right[s] of the people" in the Second and Fourth Amendments "unambiguously refer to individual rights").

This is especially true considering that personal security and the right to be free from unreasonable searches and seizures are similar interests.  *Heller*, 554 U.S. at 635 (The Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."); *Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and

there be free from unreasonable governmental intrusion.'" (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Indeed, the District Court recognized the similarity in granting the preliminary injunction:

> While often temporary, a tent is more importantly a place—just like a home—where a person withdraws from public view, and seeks privacy and security for himself and perhaps also for his family and/or his property. Indeed, a typical home at the time the Second Amendment was passed was cramped and drafty with a dirt floor— more akin to a large tent than a modern home. Americans in 1791 … were probably more apt to see a tent as a home than we are today…. Moreover, under Fourth Amendment analysis, "tents are protected … like a more permanent structure," and are deemed to be "more like a house than a car." [*Gooch*, 6 F.3d at 677]. The privacy concerns of the Fourth Amendment carry over well into the Second Amendment's security concerns.

ER25–26; *see* ER26 ("The regulation at issue would ban firearms and ammunition in a tent on the Corps' sites. This ban poses a substantial burden on a core Second Amendment right and is therefore subject to strict scrutiny."). Thus, the Second Amendment applies inside tents on public lands. In fact, the Corps has not suggested otherwise.

### C. The Second Amendment Applies On Corps-Managed Lands.

The Corps implicitly concedes that the Second Amendment applies outside the home. *See* Corps Br. at 8–10. Despite this, the Corps takes the position that its ban does not burden conduct protected by the Second Amendment. Corps Br. at 8–15. In an effort to support its illogical position, the Corps argues that its lands

are "sensitive places," as that term was used in *Heller*. Corps Br. at 11–12. In the alternative, the Corps argues that the Second Amendment does not apply on lands owned by the United States or, at a minimum, those lands managed by an agency within the U.S. Army. *Id*. at 12–14. The flaws with the Corps' arguments are manifest.

### 1.    Corps-managed lands are not sensitive places.

The Corps' "sensitive places" argument is based upon this statement in *Heller*:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or *laws forbidding the carrying of firearms in sensitive places such as schools and government buildings*, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626–27 (emphasis added). According to the Corps, all 12 million acres of land and water that it manages are "sensitive places" and therefore its ban does not burden conduct protected by the Second Amendment.[12]  Corps Br. at 11. The

---

[12] The Corps also tries to characterize its ban as a "longstanding prohibition[]" because it was promulgated in 1973. Corps Br. 12–13. Yet, the firearms ban struck down in *Heller*, was nearly as "longstanding," in that it was enacted in 1975. *See Heller*, 554 U.S. at 676 n.38 (Stevens, J., dissenting). The Corps also tries to age its ban by citing a 1947 Corps' regulation, which prohibited "loaded firearms" at one Corps' site in Oklahoma. Corp Br. at 2 n.1 and 12–13. Because this regulation prohibited only "[l]oaded firearms[,]" presumably visitors could carry unloaded firearms along with ammunition for self-defense purposes. 12 Fed. Reg. 8,725, 8,726 (Dec. 23, 1947). This would make the regulation closer to being constitutional. *See United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir.

flaw with the Corps' argument is two-fold.  First, the Corps has not proven that Corps-managed lands in Idaho are sensitive places.  Second, even if Corps-managed lands in Idaho were presumed sensitive places, the Corps' ban would still burden conduct protected by the Second Amendment, requiring the Corps to prove the constitutionality of its ban.

It stretches credulity to believe that Supreme Court was contemplating large, outdoor, recreational areas when it coined the term "sensitive places."  *See* ER9 (District Court recognizing that the "'sensitive place' analysis applies to facilities like 'schools and government buildings[,]'" not "'outdoor parks'" as suggested by the Corps.).  Nor was the Court contemplating backcountry, recreational areas in Idaho, such as Dworshak Dam and Reservoir, which:

> [C]ontains about 50,800 acres.  At normal full pool, the surface area of Dworshak Reservoir is about 20,000 acres. There are about 30,000 acres of project lands surrounding the reservoir used for public recreation purposes, wildlife habitat, wildlife mitigation and log-handling facilities....  Recreation opportunities include boating, water-skiing, fishing, developed and *primitive camping*, picnicking, hiking

2011) (upholding National Park Service regulation that prohibited visitors from possessing loaded firearms within their motor vehicles, in part, because such visitors were not entirely defenseless in that they could still possess unloaded firearms along with ammunition in their cars).  In any event, even if the 1947 regulation were relevant, a regulation of that vintage is not "longstanding" within the meaning of *Heller*.  Moreover, the 1947 regulation proves that the Corps can tailor its regulations to specific Corps-managed lands, obviating any need for a one-size-fits-all regulation, such as 36 C.F.R. § 327.13(a).  *See Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010) (administrative convenience is not a legitimate reason for violating the Constitution).

and *hunting*....  Visitation to Dworshak during fiscal year 2009 was
146,483.

http://www.nww.usace.army.mil/Locations/DistrictLocksandDams/DworshakDam

andReservoir.aspx (last checked July 7, 2015) (all emphasis added).[13]

　　To the contrary, by listing "schools and government buildings" as two

examples of "sensitive places," it is reasonable to assume that the Court intended

for the term to be limited to similar locations, *e.g.*, those with four walls and a roof.

Or, at a minimum, it is reasonable to assume that the Court intended to limit

sensitive places to buildings and areas where public access is restricted (*e.g.*,

schools and playgrounds) or where there is security screening and/or an effective

law enforcement presence (*e.g.*, courthouses and airports).[14]

---

[13] This Court may take judicial notice of the Corps' own information.

[14] Plaintiffs acknowledge *United States v. Dorosan*, 350 F. App'x 874 (5th Cir.
2009) and *Bonidy v. USPS*, 2015 WL 3916547 (10th Cir. 2015).  In *Dorosan*, a
non-public, employee parking lot adjacent to the post office and enclosed by a gate
was deemed a sensitive place.  *See United States v. Dorosan*, 2008 WL 2622996,
at *1 (E.D. La. June 30, 2008) *aff'd*, 2009 WL 273300 (E.D. La. Jan. 28, 2009).  In
*Bonidy*, both a post office and its adjacent public parking lot were deemed
sensitive places.  2015 WL 3916547 at *3; *but see id*. at **11–19  (Tymcovich, J.,
dissenting) (noting that some post office parking lots could be considered
"sensitive places," and concluding that the USPS had not carried its burden of
proving that this particular parking lot was so sensitive to warrant the significance
burden on the plaintiff's Second Amendment rights).  At most, *Dorosan* and
*Bonidy* suggest that some post offices and some adjacent parking lots may be
sensitive places.  They do not stand for the proposition that all government
buildings or all lands owned by the United States are sensitive places.

Yet, Corps-managed lands satisfy none of these criteria. Although the Corps-managed lands are generally open to all members of the public, there is neither security screening, nor an effective law enforcement presence. SER7. In fact, the Corps admits that its park rangers are not trained in law enforcement, do not perform typical law enforcement functions, and do not carry firearms. Corps Br. at 22; ER38. Instead, visitors to Corps-manage lands must rely on the ability of state and local authorities to respond in a timely manner for their personal safety. ER38. Without security screening or an effective law enforcement presence, the Corps cannot seriously contend that the lands it manages are sensitive places.

Nevertheless, the Corps argues that its lands must be sensitive places because some of its "dams and related structures" were designated as "critical infrastructure," given that a "catastrophic failure" at one of these locations could have devastating effects. Corps Br. at 12 (citing ER11–12); *see* ER39. No one disputes that a failure of a dam could be devastating. Yet, those "dams and related structures" are not at issue in this case because one would presume that public access to designated "critical infrastructure" is already restricted.[15] *See* SER31

---

[15] Congress may have already protected these dams and related structures through 18 U.S.C. § 930(a), which makes it generally unlawful to possess a firearm in a "Federal facility." *Id*. § 930(g)(1) (Defining "Federal facility" to mean "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official

("[A]djacent facilities such as powerhouses, may require restricted access which will be controlled by others. Additional security for these areas may be provided by the Park Ranger staff or contract law enforcement personnel."). Instead, what is at issue in this case are the Corps-managed lands that are open to the public for recreational use, such as campsites, trails, water bodies, backcountry areas, and public parking areas.[16] Moreover, if Corps-managed lands near designated "critical infrastructure" were so important to the protection of that infrastructure, Congress would have authorized Corps park rangers to carry firearms.

In any event, 36 C.F.R. § 327.13(a) itself belies the Corps' sensitive places argument. This regulation expressly authorizes the possession and use of loaded firearms for hunting and target shooting on Corp-managed lands. 36 C.F.R. § 327.13(a)(2) (authorizing the possession and use of loaded firearms for hunting); *id* § 327.13(a)(3) (authorizing the possession and use of loaded firearms at shooting ranges). The Corps cannot honestly argue that its managed lands are sensitive places so as to justify a ban on possessing and carrying a firearm for self-defense

---

duties."); *see id.* § 930(h) (requiring that notice of the firearms restriction in § 930(a) "shall be posted conspicuously at each public entrance to each Federal facility ….").

[16] Under the Corps' ban, Plaintiffs cannot even store their firearms in a locked, compartment in their vehicles while recreating on Corps-managed lands. 36 C.F.R. § 327.13(a). This effectively disarms them while traveling to and from Corps-managed lands. *See* SER 9–10.

while firearms are being used for hunting and target shooting on those very same lands.[17]

Notwithstanding that hunting and target shooting occur on its lands, the Corps argues that its lands are sensitive places, like schools and government buildings, because its lands may host "dense concentrations" of individuals with "diverse backgrounds." Corps Br. at 11. The Corps' analogy misses the mark.

If sensitive places were determined solely by the presence of a dense concentration of individuals with diverse backgrounds, the Second Amendment would not apply outside the home. Yet, as demonstrated above and as implicitly conceded by the Corps, the Second Amendment does apply outside the home. It also applies outside the home in areas with a high concentration of individuals with diverse backgrounds, like Chicago, Illinois. *See Moore*, 702 F.3d 933, 934–42 (holding that Illinois statutes, which generally prohibited the carrying of firearms outside the home, violated the Second Amendment). Simply put, a dense

_____

[17] Other federal land management agencies generally allow law-abiding, responsible citizens to possess and carry firearms for self-defense. 43 C.F.R. § 423.30 (Bureau of Reclamation); 36 C.F.R. § 261.58(m) (Forest Service); 43 C.F.R. § 8365.1–7 (Bureau of Land Management). In Section 512 of the Credit Card Act of 2009, Pub. L. 111-24, 123 Stat 1734 (2009), which is titled "Protecting Americans From Violent Crime," Congress reaffirmed that law-abiding, responsible citizens could possess and carry firearms for self-defense while recreating in National Parks and National Wildlife Refuges. Section 512 is reproduced in the Addendum.

concentration of individuals with diverse backgrounds cannot nullify constitutional rights.

Even if a dense concentration of individuals with diverse backgrounds could qualify an area as a sensitive place, the Corps has not proven that a dense concentration of individuals ever exists on Corps-managed lands in Idaho. For example, the Corps-managed Dworshak Dam and Reservoir in Idaho had only 146,483 visitors in FY 2009.

ehttp://www.nww.usace.army.mil/Locations/DistrictLocksandDams/DworshakDa mandReservoir.aspx (last checked July 7, 2015). This equates to approximately 400 visitors per day. Considering that the Corps manages 50,000 acres at the Dworshak Dam and Reservoir (*id.*), the visitor concentration level is 0.8 persons per 100 acres per day. This is not a dense concentration. Therefore, the Corps' argument about dense concentration of individuals with diverse backgrounds simply does not fly with Corps-managed land in Idaho.

The Corps also cites the vacated panel opinion in *Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009),[18] for the proposition that outdoor areas in general can be sensitive places.[19] Corps Br. at 14–15. From this, the Corps concludes that the

---

[18] On July 12, 2010, the panel opinion was vacated and the case was remanded in light of *McDonald*. *Nordyke v. King*, 611 F.3d 1015 (9th Cir. 2010) (*en banc*).

[19] The Corps also cites *Warden v. Nickels*, 697 F. Supp. 2d 1221, 1228 (W.D. Wash. 2010) in support of its proposition. Corps Br. at 15. *Warden* is inapposite because it was pre-*McDonald* (which held that the Second Amendment applies

lands it manages are sensitive places. *Id.* The Corps' reliance on the vacated panel decision *Nordyke* is badly misplaced.

*Nordyke* did not involve the right of law-abiding, responsible citizens to possess or carry firearms for self-defense. Instead, *Nordyke* involved a challenge by gun show promoters to a county ordinance that banned firearms at the Alameda County, California fairgrounds, where the gun show promoters sought to display firearms for sale. 563 F.3d at 443–44. Thus, the ordinance only indirectly implicated the Second Amendment by purportedly making it harder for people to purchase guns.[20] *Id.* at 458.

In denying the gun show promoters leave to amend their complaint to add a Second Amendment claim in light of *Heller*, the panel ruled that the proposed amendment would be futile because, *inter alia*, the county fairgrounds was a sensitive place. *Id.* at 459–60. In making this determination, the panel simply equated sensitive places with "gathering places where high numbers of people might congregate" and noted that the gun show promoters admitted that their gun shows attracted 4,000 visitors. *Id.* at 460.

---

against the States), was based upon the Washington State Constitution, and involved a city park. 697 F. Supp. 2d at 1228–29.

[20] This attenuated Second Amendment claim, in and of itself, distinguishes *Nordyke* from the instant case, where the core right of possessing and carrying firearms for self-defense is at issue.

With all due respect to the *Nordyke* panel, it is doubtful that the Supreme

Court was thinking about "gathering places where high numbers of people might

congregate" when it stated that that laws prohibiting firearms in sensitive places

were presumptively lawful.  Such a test is totally subjective and could be used to

cabin the Second Amendment to inside the home.[21]  Even if "gathering places

where high numbers of people might congregate" were the appropriate test, Corps-

managed lands in Idaho would not satisfy that test.[22]  Nor would a finding that

Corps-managed lands in Idaho were sensitive places suddenly end the inquiry, as it

apparently did in *Nordyke*.[23]  563 F.3d at 460.  Instead, bans on firearms in

sensitive places are only presumptively lawful, which means their lawfulness can

---

[21] It is unclear if camping is allowed on the county's fairgrounds.  Thus, whatever persuasive value that the vacated panel opinion may have, it sheds no light of the District Court's entry of judgment in favor of Plaintiffs as to their claim regarding possessing loaded firearms for self-defense inside a tent on Corps-managed lands. *See* ER4, ER50.  In any event, as demonstrated below, the Corps has waived any challenge to this aspect of the District Court's judgment.

[22] No reasonable person would equate the Alameda County, California fairgrounds with the Corps-managed lands in Idaho, which include backcountry areas where self-defense may be needed against four-legged predators, such as bears, mountain lions, and wolves.

[23] After remand, the county interpreted its ordinance as allowing the display of firearms at the fairgrounds, as long as they were securely fastened to prevent unauthorized use.  *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (*en banc*). Because this interpretation turned the ordinance into a regulation as to how the firearms were to be displayed, as opposed to an outright ban, the *en banc* panel ruled that ordinance did not violate the Second Amendment (*id.*), effectively rendering the sensitive place discussion in the vacated panel decision *dicta*.

be challenged in an as-applied challenge. The panel in *Nordyke* simply failed to consider this.

Even if Corps-managed lands in Idaho were presumed sensitive places, nothing in *Heller* suggests that "laws forbidding the carrying of firearms in sensitive places" does not burden conduct protected by the Second Amendment. *Cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 383–85 (1992) (ruling that prohibitions on obscenity and fighting words burdened First Amendment conduct, even though such speech was long believed to be outside the scope of the First Amendment). Instead, the Court simply stated that such laws were "presumptively lawful." *Heller*, 554 U.S. at 627 n.26. Thus, the Court implicitly recognized that "laws forbidding the carrying of firearms in sensitive places" burdened conduct protected by the Second Amendment. Indeed, by saying such laws are "presumptively lawful," the Court acknowledged that such laws could violate the Second Amendment under specific circumstances presented in an as applied challenge. *See United States v. Barton*, 633 F.3d 168, 173 (3d Cir. 2011) ("*As the Government concedes*, *Heller*'s statement regarding the presumptive validity of felon gun dispossession statutes does not foreclose Barton's as-applied challenge. By describing the felon disarmament ban as "presumptively" lawful …, the Supreme Court implied that the presumption may be rebutted.") (emphasis added); *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) (same).

Therefore, even if Corps-managed lands in Idaho were presumed sensitive places, the Corps still has to shoulder the burden of litigation in the instant as applied challenge. For example, as to 18 U.S.C. § 922(g)(1), which disarms felons and which the Supreme Court suggested was presumptively lawful, the Seventh Circuit explained:

> [T]he government does not get a free pass simply because Congress has established a "categorical ban"; it still must prove that the ban is constitutional, a mandate that flows from *Heller* itself. *Heller* referred to felon disarmament bans only as "presumptively lawful," which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge. *Therefore, putting the government through its paces in proving the constitutionality of § 922(g)(1) is only proper*.

*United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (emphasis added). Therefore, at a minimum, the Corps still has to prove the constitutionality of its ban on Corps-managed lands in Idaho.

The Corps tries to avoid shouldering the burden of litigation by citing *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010). Corps Br. 9–10. According to the Corps, *Vongxay* stands for the broad proposition that none of *Heller*'s "presumptively lawful" restrictions burden conduct protected by the Second Amendment. *Id*. The Corps reads way too much into that case.

In *Vongxay,* a previously convicted felon, challenged his subsequent conviction under 18 U.S.C. § 922(g)(1), arguing that, under *Heller*, the statute was unconstitutional in that it violated his Second Amendment rights. 594 F.3d at

1114.  In so doing, the felon argued that the statement in *Heller*, that "longstanding prohibitions on the possession of firearms by felons" were "presumptively lawful" was *dicta*.  *Id*. at 1115.  This Court rejected that argument and ruled that 18 U.S.C. § 922(g)(1) did not violate the Second Amendment as applied to the felon, because "felons' Second Amendment rights can be reasonably restricted."  *Id*. at 1117.  This ruling means felons have Second Amendment rights, but that those rights may be restricted.  From this, it is evident that § 922(g)(1) burdens conduct protected by the Second Amendment.[24]  Thus, contrary to the Corps' argument, presumptively lawful restrictions do burden conduct protected by the Second Amendment, requiring the Corps to prove the constitutionality of its ban.[25]

> **2.    Lands owned by the United States or lands managed by agencies within the U.S. Army are not Second Amendment-free zones.**

---

[24] The Corps cites *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (*per curiam*) for the same proposition it cites *Vongxay*.  Corps. Br. at 10.  Yet, like this Court in *Vongxay*, the Eleventh Circuit recognized that presumptively lawful restrictions burden conducted protected by the Second Amendment.  *Rozier*, 598 F.3d at 771 ("While felons do not forfeit their constitutional rights upon being convicted, their status as felons substantially affects the level of protection those rights are accorded.").

[25] In *Chovan*, this Court applied intermediate scrutiny in an as applied challenge to 18 U.S.C. § 922(g)(9), which prohibits domestic violence misdemeanants from possessing firearms.  735 F.3d at 1141–42.  This indicates that presumptively lawful restrictions do burden conduct protected by the Second Amendment.  *See* Corps Br. at 16 (recognizing that *Chovan* got to the second part of the two-part test).

Perhaps recognizing the weakness of its sensitive places argument, the Corps also argues that its ban does not burden conduct protected by the Second Amendment because the Amendment does not apply to lands owned by the United States:

> Neither plaintiffs nor the district court has pointed to anything in the historical record suggesting that the Second Amendment was designed to protect self-defense rights when on government property ….

Corps Br. at 12.[26]  In support of this argument, the Corps invokes the Property Clause (Corps Br. at 13), which provides "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States …." U.S. Const. art. IV § 3, cl. 2 (emphasis added).  According to the Corps, when the federal government is acting as a property owner, it can eliminate the right to keep and bear arms on its property without burdening conduct protected by the Second Amendment.  Corps. Br. 12–14.

Whatever power Congress may possess under the Property Clause, that power does not *ipso facto* trump constitutional rights.  *See United States v. Kokinda*, 497 U.S. 720, 725 (1990) (plurality opinion) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First

---

[26]  The Framers of the Second Amendment would be shocked to read the quoted language.  So would the homesteaders and miners who undoubtedly carried firearms for self-defense on lands owned by the United States in the 19th century, while settling Idaho and the other western States.

Amendment constraints, as does a private business …."); *cf. Printz v. United States*, 521 U.S. 898, 938–39 (1997) (Thomas, J., concurring) (suggesting, pre-*Heller*, that Congress's Commerce Clause power could not *ipso facto* trump Second Amendment rights, if those rights were ultimately determined to be personal rights). Because Congress may not simply declare that the Second Amendment does not apply to lands owned by the United States, a statute banning the possession and carrying of firearms for self-defense on lands owned by the Unites States would necessarily burden conduct protected by the Second Amendment. *See Marbury v. Madison*, 5 U.S. 137, 176–77 (1803) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written…. It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act."). It is axiomatic that Corps' authority cannot exceed the scope of Congress's authority. *See Louisiana Public Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency ... has no power to act ... unless and until Congress confers powers upon it."). Therefore, the Corps' ban burdens conduct protected by the Second Amendment.[27]

---

[27] According to the Corps, *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591 (2008) supports its argument that when a federal agency acts like a proprietor and bans the possession and carrying of firearms for self-defense on its land it does not burden conduct protected by the Second Amendment. Corps Br. at 13–14. *Engquist*, however, involved an equal protection claim brought by a government employee

Finally, the Corps also argues that the Second Amendment does not apply to the lands it manages because it is part of the U.S. Army. Corps Br. at 14. That the Corps is part of the U.S. Army does not make Corps-managed lands Second Amendment-free-zones. This is especially true considering that the Corps' manages these lands as part of its civil works mission—not its military mission. ER 35; SER11–12. Thus, contrary to the Corps' suggestion (Corps Br. at 14), the Corps-managed lands at issue in this case are not military installations, where national security concerns are most acute. *See United States v. Apel*, 134 S. Ct. 1144, 1147–49 (2014) (noting that Vandenberg Air Force Base, which contains "sensitive missile and space launch facilities[,]" "would naturally be described as a 'military installation'"). Nor does the fact that the Corps has some discretion to close its lands to public use transform its lands into Second Amendment-free-zones when open to the public. *See* Corps Br. at 14. Presumably, base commanders have even greater authority to close military installations to the public; yet, it is well established that the Bill of Rights still applies on military installations. *United States v. Albertini*, 472 U.S. 675, 688–90 (1985) (recognizing that First and Fifth

---

against a government employer. 553 U.S. at 594. At best, *Engquist* stands for the unremarkable proposition that the "government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large." *Id*. at 599. Thus, although *Engquist* might allow the Corps to prohibit its employees from carrying firearms for self-defense on Corps-managed lands, it does not mean that the Corps can apply the same prohibition to non-employees without burdening conduct protected by the Second Amendment. *See NASA v. Nelson*, 562 U.S. 134, 147–49 (2011).

Amendments apply on military installations open to the public); *Apel*, 134 S. Ct. at 1154–55 (Ginsburg, J., concurring) ("When the Government permits the public onto part of its property, in either a traditional or designated public forum, its 'ability to permissibly restrict expressive conduct is very limited.'") (quoting *United States v. Grace*, 461 U.S. 171, 177 (1983)).  Because the Bill of Rights applies on military installations, *a fortiori*, the Second Amendment applies on Corps-managed lands.  Therefore, the Corps' ban burdens conduct protected by the Second Amendment.

## III.  THE CORPS' BAN VIOLATES THE SECOND AMENDMENT.

Because the Corps' ban on possessing and carrying loaded firearms for self-defense burdens conduct protected by the Second Amendment, it must be analyzed under either the categorical test or, at a minimum, strict or intermediate scrutiny. As demonstrated below, the ban does not pass muster under any of these tests.

### A.  The Corps' Ban Is Categorically Unconstitutional.

A restriction that abrogates a core Second Amendment right is categorically unconstitutional.  *Heller*, 554 U.S. at 628–29.  The Corps' ban prohibits law-abiding, responsible citizens from possessing (in a tent) and carrying (openly, concealed, or in a vehicle) a loaded firearm for self-defense on Corps-managed lands.  As determined by the District Court, the Corps' ban is categorically unconstitutional:

> [T]his complete ban goes beyond merely burdening Second
> Amendment rights but "destroys" those rights for law-abiding citizens
> carrying operable firearms for the lawful purpose of self-defense."
> Accordingly, the Corps' regulation is unconstitutional "under any
> light"—that is, it is invalid no matter what degree of scrutiny is used
> in its evaluation.

ER8 (quoting *Peruta*, 742 F.3d 1168–70); ER13 ("While the Corps retains the right to regulate the possession and carrying of handguns on Corps property, this regulation imposes an outright ban, and is therefore unconstitutional under any level of scrutiny, as set forth in *Heller* and *Peruta*."). Based upon this determination, the District Court entered judgment in favor of Plaintiffs as to both of their claims for relief. SER36–37.

The Corps makes no appreciable effort to defend its ban vis-à-vis the possession of loaded firearms for self-defense in tents on Corps-managed lands. As demonstrated above and as noted by the District Court, a temporary dwelling, like a tent, is analogous to a home. Part II-B, *supra*; ER25–26. Thus, the same Second Amendment rights should apply in both places. Part II-B, *supra*. *Heller* stands for the proposition that a ban on possessing loaded firearms for self-defense in the home is categorically unconstitutional. 554 U.S. at 635–36. The District Court's grant of summary judgment in favor of Plaintiffs' as to their First Claim for Relief is perfectly in line with *Heller*. *See* ER13–14, 25–26, 50, SER36–37. By not addressing these issues in its opening brief, the Corps has waived any argument to the contrary and has effectively conceded that its ban destroys the

right of law-abiding, responsible citizens to possess loaded firearms for self-defense in a tent on Corps-managed lands. *Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487–88 (9th Cir. 2010) ("[W]e've refused to address claims that were only argued in passing, … or that were bare assertions … with no supporting argument.") (internal quotations, citations, and alterations omitted); *see United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones…. Judges are not expected to be mindreaders." (internal quotations omitted)). Therefore, this Court should uphold the District Court's determination that the Corps' ban is categorically unconstitutional as to the possession of loaded firearms for self-defense in tents on Corps-managed lands and affirm the District Court's judgment as to Plaintiffs' First Claim for Relief.

The Corps weakly attempts to defend its ban on carrying loaded firearms for self-defense outside tents by arguing that its ban does not destroy Second Amendment rights, but imposes only a "partial restriction on firearms use on government property …." Corps Br. at 16. This "partial restriction" argument is presumably based on the fact that "Plaintiffs may use firearms at shooting ranges or for hunting in designated areas" on Corps-managed lands. Corps Br. at 18. Although hunting and target shooting are protected by the Second Amendment,

this case is not about those activities.[28]  In fact, that hunting and target shooting may occur on Corps-manage lands is cold comfort to Plaintiffs, who want to simply possess and carry loaded firearms for self-defense.  Accordingly, the District Court properly ruled that Corps' ban is categorically unconstitutional and this Court should affirm that ruling and the District Court's judgment.

### B.    The Corps' Ban Does Not Survive Strict Scrutiny.

Even if the Corps' ban is not categorically unconstitutional, it fails strict scrutiny.  Strict scrutiny is regularly applied when fundamental rights are involved. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973) (laws that "impinge[] upon a fundamental right explicitly or implicitly protected by the Constitution" are subject to strict scrutiny); *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).  It is undeniable that the Second Amendment protects fundamental rights.  *McDonald*, 561 U.S. at 778 ("[I]t is clear that the Framers … counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."); *id*. at 769 ("Antifederalists and Federalists alike agreed that the right to bear arms was fundamental to the newly formed system of government."); *see id*. at 806 (Thomas, J., concurring in part and concurring in the

---

[28] The Corps has not suggested that 36 C.F.R. § 327.13(a) allows hunters and target shooters to use their firearms in self-defense.  *See* Corps Br. at 18.  Thus, 36 C.F.R. § 327.13(a) is a complete ban on the use of firearms for self-defense on Corps-managed lands.  *See Heller*, 554 U.S. at 630 (refusing to read an implied exception for self-defense into the challenged law).

judgment). These principles—that strict scrutiny applies to laws affecting fundamental rights and that the Second Amendment protects a fundamental right—taken together compel the conclusion that restrictions on the right to keep and bear arms must, at a minimum, be subjected to strict scrutiny.

Indeed, strict scrutiny would also apply under this Court's two-step analysis because the Corps' ban imposes a severe restriction on the core protection of the Second Amendment, *i.e.*, the right to keep and bear arms for self-defense. The Corps' ban prohibits law-abiding, responsible citizens from possessing and carrying a loaded firearm for self-defense on Corps-managed lands. This is undoubtedly a severe restriction triggering strict scrutiny review.

The Corps cites the Fourth Circuit's opinion in *Masciandaro* for the proposition that intermediate, not strict scrutiny, should apply because the lands at issue are managed by a federal agency. Corps Br. 18–19. Yet, the National Park Service regulation at issue in *Masciandaro* was not as severe as the Corps' ban in the instant case. The National Park Service regulation prohibited only the possession of a loaded weapon in a motor vehicle within a National Park area. *Masciandaro*, 638 F.3d at 460. "By permitting park patrons to carry unloaded firearms within their vehicles," the challenged regulation "le[ft] largely intact the right to 'possess and carry weapons in case of confrontation.'" *Id*. at 474 (quoting *Heller*, 554 U.S. at 592). In contrast, the Corps' ban completely prohibits both:

37

(1) possessing and carrying loaded firearms for self-defense; and (2) possessing and carrying unloaded firearms with ammunition for self-defense. Thus, under the Corps' ban, nothing remains of the right to possess and carry firearms in case of confrontation. Therefore, contrary to the Corps' argument, *Masciandaro* confirms that strict scrutiny must be applied to the Corps ban because of the exponentially greater burden on—if not the destruction of—the right to possess and carry loaded firearms in case of confrontation.

The Corps tries to downplay the severity of the burden on Plaintiffs' Second Amendment rights by suggesting that Plaintiffs can exercise their Second Amendment rights off of Corps-managed lands. This is a specious argument. The fundamental right to self-defense must be exercised wherever the person "happens to be." *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1515 (2009) ("And of course people's ability to protect themselves elsewhere is no substitute for their ability to protect themselves where they are…. [S]elf-defense has to take place wherever the person happens to be."). No one should have to relinquish the fundamental right to keep and bear arms for self-defense in order to enjoy the use of public lands, including Corps-managed lands. If the Corps' argument were accepted, the Corps could get away with prohibiting the exercise of all First Amendment rights on its lands simply because those rights

could be exercised elsewhere.  Yet, as demonstrated above, when lands owned by the United States are open to the public, the First Amendment applies, even though those rights may be exercised elsewhere.  Part __, *supra*.  Because the Second Amendment may not "be singled out for special—and specially unfavorable— treatments." *McDonald*, 561 U.S. at 778–79, the severe burden on Plaintiffs' Second Amendment rights is not lessened merely because they may exercise those rights elsewhere.

In fact, the Seventh Circuit has expressly rejected the type of flawed reasoning employed by the Corps here:

> This reasoning assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction.  That's a profoundly mistaken assumption.  In the First Amendment context, the Supreme Court long ago made it clear that one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.  The same principle applies here.  It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs.  That sort of argument should be no less unimaginable in the Second Amendment context.

*Ezell*, 651 F.3d at 697 (internal quotations and citations omitted).

Thus, contrary to the Corps' arguments, the Corps' ban does impose a severe restriction on the core protection of the Second Amendment, *i.e.*, the right to keep and bear arms for self-defense.  Therefore, strict scrutiny must be applied to the Corps' ban.  As demonstrated below, the Corps' ban flunks that test.

Under strict scrutiny, the Corps' ban is not accorded a presumption of constitutionality. Instead the Corps must carry the heavy burden of proving that its ban is narrowly tailored to serve a compelling government interest. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (The government must prove that its restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." (quotation omitted)). The Corps has not satisfied this heavy evidentiary burden.

The Corps' asserted justification for its ban is its interests "in promoting order and public safety on the land it manages, protecting its water resource development projects, and protecting visitors from the risk of firearm violence." Corps Br. at 20. In a facial challenge, these generalized public safety concerns may qualify as a compelling interest. But, in an as applied challenge, such as this case, the compelling interest must be based upon the facts and circumstance of the particular suit. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ("It is axiomatic that a 'statute may be invalid as applied to one state of facts and yet valid as applied to another.'" (quoting *Dahnke–Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)); *Citizens United v. Gessler*, 773 F.3d 200, 216 (10th Cir. 2014) ("Courts can, and often do, recognize the overall propriety of a statutory scheme while still invalidating its application in a specific case."). The Corps has provided no evidence supporting its public safety

concerns vis-a-vis Corps' managed lands in Idaho. *Cf. United States v. Doe*, 968

F.2d 86, 90 (D.C. Cir. 1992) (Whether a restriction is narrowly tailored must be

judged "in a realistic manner which takes into account the nature and traditional

uses *of the particular park involved*. Lafayette Park is not Okefenokee National

Wildlife Refuge, even if both are under the Park Service's supervision." (emphasis

added)). Nor has the Corps provided any evidence that law-abiding, responsible

citizens, such as Plaintiffs, pose a public safety concern.

The Corps' "evidence" largely consists of the following self-serving

statement:

> In general, Corps recreation facilities have a high density of use
> because many projects are close to major population centers. The
> Corps must consider potential sources of conflict between visitors and
> craft regulations to mitigate the sources of conflict. For example,
> visitors staying at campgrounds sleep, cook meals, socialize with their
> companions, and enjoy nature all within a limited space. Sources of
> conflict include preferences for varying tastes of music at different
> audible levels, loud socializing at times inconvenient to other visitors,
> consumption of alcohol and general infringements on other users'
> space…. The presence of a loaded firearm could far more quickly
> escalate such tension between visitors from a minor disagreement to a
> significant threat to public safety involving the potential use of deadly
> force by a visitor against another visitor or unarmed Corps Park
> Ranger.

ER37–38.

The Corps' "evidence" is pure conjecture and shows that little, if any,

consideration was given to the personal security concerns of law abiding,

responsible citizens. The Corps' "evidence" also shows nothing about Corps-

managed lands in Idaho—the 13th least-populated State, with a population of only

1.6 million people.  U.S. Census Bureau, *Annual Estimates of the Resident*

*Population for the United States* (December 2014),

http://www.census.gov/popest/data/state/totals/2014/index.html (last checked July

7, 2015).[29]  Nor do Corps-managed lands in Idaho have high visitor levels.  Even if

the Corps' "evidence" could be applied to Corps-managed lands in Idaho, what it

shows is that alcohol consumption, loud music, and annoying behavior are the real

culprits.  Yet, the Corps has a regulation allowing it to limit alcohol consumption.

36 C.F.R. § 327.12(e).  The Corps also has regulations prohibiting loud music and

annoying behavior.  36 C.F.R. §§ 327.12(b), (c), (d), and (f).  That the Corps

apparently chooses not to enforce these regulations is no reason to infringe on

constitutional rights.[30]

The "evidence" also shows that the Corps' primary grievance is that

Congress has not authorized its park ranger to carry firearms.  Corps Br. at 22–23;

ER38.  That Congress has not authorized Corps park rangers to carry firearms is no

---

[29] This Court may take judicial notice of information published by the U.S. Census Bureau.  *See United States v. Esquivel*, 88 F.3d 722, 726–27 (9th Cir. 1996).

[30] According to the Corps, because it can regulate boating and swimming, it "is similarly permissible for [it] to restrict possession of firearms …."  Corps Br. at 11. "[T]he people" do not have a fundamental right to boat and swim, but do have a fundamental right to "keep and bear Arms."  U.S. Const. amend. II.

reason to infringe the Second Amendment rights of law-abiding, responsible citizens.  Instead, the Corps should take its grievance to Congress.

In short, the Corps' generalized public safety concerns is not a compelling interest to infringe upon Second Amendment rights of law-abiding, responsible citizens on Corps-managed lands in Idaho.  *Cf. United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000) (Congress "must present more than anecdote and supposition" to establish a compelling interest to justify a nationwide restriction.).[31]  This conclusion is supported by the fact that the "[t]he right to keep and bear arms … is not the only constitutional right that has controversial public safety implications."  *McDonald*, 561 U.S. at 783.  Indeed, as explained, by the District Court,

> The Corps cites [its public safety] considerations to support the ban imposed by its regulation.  But *Peruta* and *Heller* rejected that line of argument:  "We are well aware that, in the judgment of many governments, the safest sort of firearm-carrying regime is one which restricts the privilege to law enforcement with only narrow exceptions.  Nonetheless, the enshrinement of constitutional rights necessarily takes certain policy choices off the table...." *Peruta*, 742 F.3d at 1178.

ER12–13.

Even if the Corps' generalized public safety concerns were a compelling interest vis-à-vis Corps' managed lands in Idaho, the Corps' ban is not narrowly

---

[31] If Congress cannot rely on "anecdote and supposition" to justify a nationwide restriction, neither may the Corps, which has significant less authority than Congress.

tailored to serve that interest. Central to narrow tailoring is the fit between the

compelling interest and the means employed to accomplish that interest. The fit

must be precise, like a hand in a glove, which means that the Corps must use the

least restrictive means possible to accomplish its stated compelling interest.

*Playboy Entm't Grp.,* 529 U.S. at 813 ("If a less restrictive alternative would serve

the Government's purpose, the legislature must use that alternative."); *Frisby v.*

*Schultz*, 487 U.S. 474, 485 (1988) ("A statute is narrowly tailored if it targets and

eliminates no more than the exact source of the "evil" it seeks to remedy." (citation

omitted)). Moreover, "[a] complete ban" on the exercise of fundamental rights can

be narrowly tailored, "but only if each activity within the proscription's scope is an

appropriately targeted evil." *Id*.

The Corps' regulation, 36 C.F.R. § 327.13(a), completely bans the

possession and carrying of loaded firearms (and unloaded firearms along with

ammunition) for self-defense. Yet, the Corps has not proven that law-abiding,

responsible citizens are an "appropriately targeted evil."[32] Nor has the Corps

proven that law-abiding, responsible citizens such as Plaintiffs, who have been

---

[32] The Framers of the Second Amendment believed "the people," could safely "bear arms" for self-defense despite public safety concerns. U.S. Const. amend. II; David B. Kopel, *The Samurai, The Mountie, And The Cowboy* 420 (1992) ("[T]he leaders of the early republic thought Americans uniquely virtuous and capable of bearing arms responsibly."). The Corps is in no position to question that judgment.

issued a license to carry a concealed handgun in the State of Idaho, are an "appropriately targeted evil." Therefore, the Corps' ban is not narrowly tailored.[33]

This conclusion is supported by the fact that the Corps has less restrictive means by which it can address its generalized public safety concerns. For example, the Bureau of Reclamation (which manages similar lands as the Corps), allows law abiding, responsible citizens to possess and carry firearms for self-defense on its lands. 43 C.F.R. §§ 423.30(a), (b). Congress has also implemented a less restrictive means vis-a-vis National Parks and National Wildlife Refuges, by allowing law-abiding, responsible citizens to possess and carry firearms for self-defense in those areas:

> The Secretary of the Interior shall not promulgate or enforce any regulation that prohibits an individual from possessing a firearm including an assembled or functional firearm in any unit of the National Park System or the National Wildlife Refuge System if—
>
> (1)     the individual is not otherwise prohibited by law from possessing the firearm; and
>
> (2)     the possession of the firearm is in compliance with the law of the State in which the unit of the National Park System or the National Wildlife Refuge System is located.

---

[33] The Corps also tries to justify its ban by arguing that it would allow early detention of any criminal threats to its projects. Corps Br. 22. As the Seventh Circuit noted, banning firearms in order to catch criminals "is a weak argument" because criminals do not brandish their guns— they conceal them, "in order to preserve the element of surprise …." *Moore*, 702 F.3d at 938.

Credit Card Act of 2009, § 512(b); Addendum.  In so doing, Congress

emphatically stated that:

> [U]nelected bureaucrats … cannot … override the Second
> Amendment rights of law-abiding citizens on 83,600,000 acres of
> National Park System land and 90,790,000 acres of land under the
> jurisdiction of the United States Fish and Wildlife Service.

*Id*. § 512(a)(7).

As the foregoing demonstrates, the Corps' asserted compelling interest is

dubious at best.  Even if the Corps properly established a compelling interest with

respect to Corps-managed lands in Idaho, its firearms ban is not narrowly tailored

to serve that compelling interest.  Therefore, this Court should affirm the judgment

of the District Court.

### C.    The Corps' Ban Does Not Survive Intermediate Scrutiny.

Under this Court's two-part test, if it were somehow determined that the

Corps' ban does not destroy or severely burden the core Second Amendment right

to possess and carry loaded firearms for self-defense, the ban must still be

subjected to intermediate scrutiny.  Under intermediate scrutiny, the Corps must

prove a "significant, substantial, or important interest[.]"  *Chovan*, 735 F.3d at

1139.  The Corps must also prove that there is a substantial relationship between

the challenged restriction and the Corps' asserted objective.  *See Chovan*, 735 F.3d

at 1142 ("[W]e conclude that the application of § 922(g)(9) to Chovan is

substantially related to the government's important interest of preventing domestic

gun violence."); *Williams*, 616 F.3d at 692 ("[U]nder intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective.").  Like with strict scrutiny, the Corps has not satisfied its burden of proof.

As demonstrated above, the Corps' generalized public safety concerns may be an important governmental interest if this were a facial challenge.  But in this as applied challenge, those generalized concerns fall short.  Without any specific evidence vis-à-vis Corps managed lands in Idaho, the Corps has not carried its burden of proof.

Even if the Corps' generalized public safety concerns were an important government interest as to Corps-managed lands in Idaho, it has not proven that its ban is substantially related to its asserted governmental interest.  A restriction that infringes on constitutional rights cannot be substantially related if it is overinclusive.  *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 285 n.19 (1985); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 569–70 (1980).  Thus, for the Corps' ban to survive intermediate scrutiny, the Corps must prove that its ban does not "'burden substantially more [conduct] than is necessary'" to achieve the Corps' asserted interest.  *Boardley v. U.S. Dept. of Interior*, 615 F.3d 508, 519 (D.C. Cir. 2010) (quoting *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 799 (1989)). Here, the Corps' ban is way too broad because it denies the right to possess and carry loaded firearms for self-defense to an entire group of individuals who pose no public safety concerns. *See Chovan*, 735 F.3d at 1138 (ruling that 18 U.S.C. § 922(g)(9) was not too broad because it exempts domestic violence misdemeanants "with expunged, pardoned, or set-aside convictions, or those who have had their civil rights restored.").

The unnecessarily burdened group consists of law-abiding, responsible citizens who are over 21 years old, have no history of substance abuse, have no criminal record, are not subject to a protection order, have demonstrated competency with a handgun, have undergone background checks, and have been approved by the State of Idaho to carry a concealed handgun in that State. SER1, 6; Idaho Code 18-3022. By definition, individuals in this group, of which Plaintiffs are a part, pose no public safety concerns. Nor would they pose public safety concerns by possessing and carrying firearms for self-defense on Corps-managed lands. *See* Philip J. Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from A Social Welfare Perspective*, 56 UCLA L. Rev. 1041, 1082 (2009) ("The available data about [concealed gun] permit holders also imply that they are at fairly low risk of misusing guns, consistent with the relatively low arrest rates observed to date for permit holders."). In fact, the Corps has not suggested otherwise, except to speculate that *anyone* possessing or carrying a firearm may

have a "chilling effect" on its park rangers.  Corps Br. at 22–23.  Yet, the individuals in this group are law-abiding, responsible citizens who have demonstrated a respect for the law and authority by satisfying the requirements for the issuance of their concealed carry licenses.  *See* SER1, 6.  In short, Corps park rangers and other visitors to Corps-managed lands have nothing to fear from the individuals in this group.

Thus, by denying the individuals in this group the right to bear arms for self-defense the Corps is not addressing its asserted public safety concerns.  Instead, the Corps is needlessly placing the individuals in this group at increased risk of harm, especially considering there is not an effective law enforcement presence on Corps managed lands.  Therefore, because the Corps is burdening substantially more conduct than is necessary to achieve its asserted interest, the Corps' ban fails intermediate scrutiny and this Court should affirm the judgment of the District Court.

### D.   The Corps' Argument For Reasonableness Review Is Spurious.

The Corps cites First Amendment forum analysis for the proposition that its ban is subject only to reasonableness review because the Corps is allegedly acting like a proprietor.  Corps Br. at 17, 19.  First Amendment forum analysis essentially asks whether the relevant government property is a traditional public forum or a designated public forum for First Amendment activities.  *Perry Education Assn. v.*

*Perry Local Educators' Assn*., 460 U.S. 37, 45–46 (1983). If so, then the restriction is generally subject to strict scrutiny. *Id*. If the relevant government property is a non-public forum, the government may impose reasonable restrictions that are viewpoint-neutral. *Id*. The Corps' reliance on First Amendment forum analysis is flawed in at least three ways.

First, *Helle*r expressly rejected rational basis or reasonableness review vis-à-vis the Second Amendment. *Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *accord Chovan*, 735 F.3d at 1137 ("The *Heller* Court did, however, indicate that rational basis review is not appropriate.").

Second, forum analysis makes no sense in the Second Amendment context because no government property is dedicated to self-defense. Instead, the nature of the interest in personal security protected by the Second Amendment demands that the Amendment apply where self-defense is necessary, not just in certain places the government may dedicate to self-defense. In fact, the idea of designating "Second Amendment zones" is ridiculous. *Cf. ISKCON Miami, Inc. v. Metropolitan Dade County*, 147 F.3d 1282, 1290 (11th Cir. 1998) ("[P]ersons wishing to distribute

literature are limited to eight areas in the airport designated by the Airport Director as 'First Amendment zones.'").

Finally, assuming forum analysis could be applied in the Second Amendment context and assuming the Corps' managed lands were non-public fora, courts have acknowledged that an outright ban on constitutionally protected activity—like that imposed by the Corps' ban—would be unconstitutional. *See Initiative and Referendum Institute v. USPS*, 417 F.3d 1299, 1315 (D.C. Cir. 2005) ("It is clear that a broadscale prohibition against asking postal patrons to sign petitions … is unconstitutional even if all postal properties are nonpublic forums."). Likewise, the Corps may not impose a "broadscale prohibition" on self-defense on Corps-managed lands in Idaho.

## IV. *GEORGIACARRY.ORG* PROVES THAT THE CORPS HAS NOT SATISFIED ITS EVIDENTIARY BURDEN IN THE INSTANT CASE.

It is anticipated that the Corps will try to justify its ban by citing the recent Eleventh Circuit opinion in *Georgiacarry.org, Inc. v. U.S. Army Corps of Engineers*, 2015 WL 3555822 (11th Cir. 2015) *aff'g*, 38 F. Supp. 3d 1365 (N.D. Ga. 2014). Because of the strategy employed in that case and its procedural posture, *Georgiacarry.org* is not the panacea that the Corps may wish it to be. In fact, *Georgiacarry.org* proves that the Corps has not satisfied it evidentiary burden in the instant case.

In *Georgiacarry.org,* the plaintiffs filed a similar Second Amendment

challenge to the Corps' ban in the United States District Court for the Northern

District of Georgia and moved for a preliminary injunction.  38 F. Supp. 3d at

1367–69.  In denying the preliminary injunction, the district court ruled that the

plaintiffs were not likely to succeed on the merits because, according to the district

court, the Corps' ban did not burden conduct protected by the Second Amendment.

*Id*. at 1376.  "[O]ut of an abundance caution," the district court also ruled that the

Corps' ban satisfied intermediate scrutiny.  *Id*. at 1376–78.

In appealing the denial of the preliminary injunction, the plaintiffs "h[u]ng

their hats on a single, sweeping argument:  that the regulation completely destroys

their Second Amendment rights, thereby obviating the need for a traditional

scrutiny analysis."  *Georgiacarry.org*, 2015 WL 3555822, at *1.  The Eleventh

Circuit rejected the plaintiffs' all-or-nothing argument because of the heavy burden

the plaintiffs faced in seeking to overturn a denial of a preliminary injunction (*id*.

at *3) the "scant preliminary injunction record," (*id*. at *5) and because the court

found that the Corps' ban did not "destroy the plaintiffs' Second Amendment

rights altogether."  *Id*. at **6–7.

In ruling that "the Corps ban did not 'destroy the plaintiffs' Second

Amendment rights altogether[,]'" the Eleventh Circuit fell for the argument that

the Corps makes here, namely that the plaintiffs can "exercise their right to bear

arms for self-defense elsewhere …." *Id*. at *7. Yet, one may not be denied a fundamental right simply because it may be exercised elsewhere. Part III-B, *supra*. For example, in *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 76–77 (1981) the borough tried to defend its ban on live entertainment because such speech could be conducted outside the borough. The Court emphatically rejected that argument: "'[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" *Id*. (quoting *Schneider v. State of New Jersey*, 308 U.S. 147, 163 (1939)).

Similarly, the Corps cannot argue that its ban does not destroy the fundamental right to keep and bear arms for self-defense simply because that right may be exercised elsewhere. If that argument were accepted, the Second Amendment would suffer a death by a thousand cuts, as jurisdiction after jurisdiction bans the right to bear arms for self-defense simply because that right may be exercised elsewhere.

Accordingly, *Georgiacarry.org* is not a magic talisman. Any persuasive value that it may have is severely limited by the strategy employed by the plaintiffs and because it was at the preliminary injunction stage.

More importantly, however, *Georgiacarry.org* does prove that the Corps has failed to carry its burden of proof in the instant case. In discussing the evidence that would be required at the merits stage, the Eleventh Circuit stressed that the

Corps would have to produce particularized evidence about the Corps-managed lands at issue:

> [W]hether the Corps property constitutes what *Heller* called a "sensitive place," we are missing basic information. Among others, we do not know the size of the Allatoona Dam, a major feature of the water resource development project .... Nor do we know the size of the recreational area at issue in this case-that is, where the plaintiffs seek to carry their weapons in this as-applied challenge.

*Georgiacarry.org,* 2015 WL 3555822, at *8.[34]

The Eleventh Circuit also strongly hinted that the Corps' generalized public safety concerns would not pass muster in an as applied challenge:

> [W]e lack much of the basic information we would need to assess the risks found at Allatoona Lake.... All we have before us is an affidavit from a single Corps Park Ranger that speaks in generalities about the presence of visitors and their potential sources of conflict. We also have no evidence about the dangers currently facing Allatoona visitors, including the frequency and nature of crimes committed or of altercations amongst visitors.... *In sum, we do not have before us any empirical data that might aid in assessing the fit between the challenged regulation and the government's asserted objective.*

*Georgiacarry.org,* 2015 WL 3555822, at *9 (emphasis added) (footnote omitted).

Similarly, in the instant case, the Corps failed to produce particularized evidence that would "aid" this Court in "assessing the fit between the challenged regulation and the government's asserted objective." Because the Corps has the

---

[34] The Allatoona Dam attracts approximately over 6 million visitors each year (*id.* at *9 n.9), in contrast to Dworshak Dam and Reservoir, which attracts only approximately 150,000 visitors each year. *See* Part II-C-1. This order of magnitude difference proves that all Corps-managed lands are not identical and proves that the Corps has not satisfied its burden of proof in the instant case.

burden of proof, whether the level of scrutiny is strict or intermediate, it has to suffer the consequence of its failure to produce the requisite evidence. Therefore, this Court should affirm the judgment of the District Court.

## V. THE PERMANENT INJUNCTION IS APPROPRIATELY LIMITED.

After holding the Corps' ban unconstitutional, the District Court permanently enjoined the Corps from enforcing its ban in the State of Idaho, where Plaintiffs reside and primarily recreate. ER4, ER13. The Corps challenge the scope of the permanent injunction by arguing that it should be limited to only Plaintiffs. Corps Br. at 26. The Corps' argument is unavailing.

"A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction. Appellate review of those terms 'is correspondingly narrow.'" *Lamb-Weston, Inc. v. McCain Foods, Ltd*., 941 F.2d 970, 974 (9th Cir. 1991) (affirming worldwide preliminary injunction) (quoting *Coca–Cola Co. v. Overland, Inc*., 692 F.2d 1250, 1256 n.16 (9th Cir. 1982)). Although an overbroad injunction may be an abuse of discretion, the District Court appropriately limited the scope of the injunction to Corps-managed lands in Idaho.

For example, if this Court affirms the District Court's judgment that the Corps' ban is unconstitutional, but limits the scope to just Plaintiffs, nothing would prevent other law-abiding, responsible citizens in Idaho from suing the Corps for declaratory and injunctive relief over its unconstitutional ban. If that were to

happen, the Corps would surely lose, either on *stare decisis* or collateral estoppel grounds, and in the process needlessly waste taxpayer money.  In addition, it would be pure folly for the Corps to seek to enforce its unconstitutional ban in Idaho.  If it did, it would surely lose, and in the process needlessly waste judicial resources.

Instead of worrying about the scope of the permanent injunction, the Corps should be focusing its efforts on making 36 C.F.R. § 327.13(a) constitutional.  As noted by the District Court, the regulation "is simply too broad.  Drafted long before *Heller* … [the] regulation needs to be brought up to date."  ER28.  Accordingly, this Court should affirm the scope of the District Court's permanent injunction because it is appropriately limited and is in the best interests of the Corps, the taxpayers, and the judiciary.

## CONCLUSION

This Court should affirm the judgment of the District Court.

Dated this 8th day of July 2015.

Respectfully submitted,

/s/ Steven J. Lechner
Steven J. Lechner
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado  80227
(303) 292-2021
lechner@mountainstateslegal.com

56

Attorney for Plaintiffs-Appellees

## **STATEMENT OF RELATED CASES**

The undersigned is unaware of any pending related cases.

Dated this 8th day of July 2015.

/s/ Steven J. Lechner
Steven J. Lechner
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado  80227
(303) 292-2021
lechner@mountainstateslegal.com

Attorney for Plaintiffs-Appellees

# CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Fed. R. App. P 32(a)(7)(C) and Ninth Circuit Rule

32-1, this brief is proportionately spaced, has a typeface of 14 points or more, and

contains 13,891 words.

Dated this 8th day of July 2015.

/s/ Steven J. Lechner
Steven J. Lechner
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado  80227
(303) 292-2021
lechner@mountainstateslegal.com

Attorney for Plaintiffs-Appellees

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Appellees'

Answering Brief and the attached Appellees' Supplemental Excerpts of Record

with the Clerk of the Court for the United States Court of Appeals for the Ninth

Circuit by using the appellate CM/ECF system on this 8th day of July 2015.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

Dated this 8th day of July 2015.

/s/ Steven J. Lechner
Steven J. Lechner
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
lechner@mountainstateslegal.com

Attorney for Plaintiffs-Appellees

# **ADDENDUM**

PL 111-24, May 22, 2009, 123 Stat 1734

UNITED STATES PUBLIC LAWS

111th Congress - First Session

Convening January 04, 2009

Additions and Deletions are not identified in this database.
Vetoed provisions within tabular material are not displayed

PL 111-24 [HR 627]
May 22, 2009
CREDIT CARD ACCOUNTABILITY RESPONSIBILITY AND
DISCLOSURE ACT OF 2009 (CREDIT CARD ACT OF 2009)

An Act To amend the Truth in Lending Act to establish fair and transparent practices relating
to the extension of credit under an open end consumer credit plan, and for other purposes.

Be it enacted by the Senate and House of Representatives
of the United States of America in Congress assembled,

**\*1764**

"Such rulemaking shall relate to unfair or deceptive acts or practices regarding
mortgage loans, which may include unfair or deceptive acts or practices
involving loan modification and foreclosure rescue services."; and

(C) by adding at the end the following:

"(2) Paragraph (1) shall not be construed to authorize the Federal Trade Commission to
promulgate a rule with respect to an entity that is not subject to enforcement of the Federal
Trade Commission Act (15 U.S.C. 41 et seq.) by the Commission.

"(3) Before issuing a final rule pursuant to the proceeding initiated under paragraph (1), the
Federal Trade Commission shall consult with the Federal Reserve Board concerning any portion
of the proposed rule applicable to acts or practices to which the provisions of the Truth in
Lending Act (15 U.S.C. 1601 et seq.) may apply.

"(4) The Federal Trade Commission shall enforce the rules issued under paragraph (1) in the
same manner, by the same means, and with the same jurisdiction, powers, and duties as though

all applicable terms and provisions of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated into and made part of this section."; and

(2) in subsection (b)--

(A) by striking so much as precedes paragraph (2) and inserting the following:

"(b)(1) Except as provided in paragraph (6), in any case in which the attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by the engagement of any person subject to a rule prescribed under subsection (a) in a practice that violates such rule, the State, as parens patriae, may bring a civil action on behalf of the residents of the State in an appropriate district court of the United States or other court of competent jurisdiction--

"(A) to enjoin that practice;

"(B) to enforce compliance with the rule;

"(C) to obtain damages, restitution, or other compensation on behalf of residents of the State; or

"(D) to obtain penalties and relief provided by the Federal Trade Commission Act and such other relief as the court considers appropriate."; and

(B) in paragraphs (2), (3), and (6), by striking "Commission" each place it appears and inserting "primary Federal regulator".

<< 15 USCA § 1638 NOTE >>

(b) EFFECTIVE DATE.--The amendments made by subsection (a) shall take effect on March 12, 2009.

<< 16 USCA § 1a-7b >>

## SEC. 512. PROTECTING AMERICANS FROM VIOLENT CRIME.

(a) CONGRESSIONAL FINDINGS.--Congress finds the following:

(1) The Second Amendment to the Constitution provides that "the right of the people to keep and bear Arms, shall not be infringed".

(2) Section 2.4(a)(1) of title 36, Code of Federal Regulations, provides that "except as otherwise provided in this section and parts 7 (special regulations) and 13 (Alaska regulations), the following are prohibited: (i) Possessing a weapon, trap or net (ii) Carrying a weapon, trap or net (iii) Using a weapon, trap or net".

**\*1765**

(3) Section 27.42 of title 50, Code of Federal Regulations, provides that, except in special circumstances, citizens of the United States may not "possess, use, or transport firearms on national wildlife refuges" of the United States Fish and Wildlife Service.

(4) The regulations described in paragraphs (2) and (3) prevent individuals complying with Federal and State laws from exercising the second amendment rights of the individuals while at units of--

(A) the National Park System; and

(B) the National Wildlife Refuge System.

(5) The existence of different laws relating to the transportation and possession of firearms at different units of the National Park System and the National Wildlife Refuge System entrapped law-abiding gun owners while at units of the National Park System and the National Wildlife Refuge System.

(6) Although the Bush administration issued new regulations relating to the Second Amendment rights of law-abiding citizens in units of the National Park System and National Wildlife Refuge System that went into effect on January 9, 2009--

(A) on March 19, 2009, the United States District Court for the District of Columbia granted a preliminary injunction with respect to the implementation and enforcement of the new regulations; and

(B) the new regulations--

(i) are under review by the administration; and

(ii) may be altered.

(7) Congress needs to weigh in on the new regulations to ensure that unelected bureaucrats and judges cannot again override the Second Amendment rights of law-abiding citizens on 83,600,000 acres of National Park System land and 90,790,000 acres of land under the jurisdiction of the United States Fish and Wildlife Service.

(8) The Federal laws should make it clear that the second amendment rights of an individual at a unit of the National Park System or the National Wildlife Refuge System should not be infringed.

(b) PROTECTING THE RIGHT OF INDIVIDUALS TO BEAR ARMS IN UNITS OF THE NATIONAL PARK SYSTEM AND THE NATIONAL WILDLIFE REFUGE SYSTEM.--The Secretary of the Interior shall not promulgate or enforce any regulation that prohibits an individual from possessing a firearm including an assembled or functional firearm in any unit of the National Park System or the National Wildlife Refuge System if--

(1) the individual is not otherwise prohibited by law from possessing the firearm; and

(2) the possession of the firearm is in compliance with the law of the State in which the unit of the National Park System or the National Wildlife Refuge System is located.

## SEC. 513. GAO STUDY AND REPORT ON FLUENCY IN THE ENGLISH LANGUAGE AND FINANCIAL LITERACY.

(a) STUDY.--The Comptroller General of the United States shall conduct a study examining--

(1) the relationship between fluency in the English language and financial literacy; and
**\*1766**

(2) the extent, if any, to which individuals whose native language is a language other than English are impeded in their conduct of their financial affairs.